# UNITED STATES COURT OF APPEALS
## For The
## DISTRICT OF COLUMBIA CIRCUIT


*In re* **SI WIRELESS, LLC**

**v.**                                                          25-1112

**FEDERAL COMMUNICATIONS COMMISSION**

---

**Petition for Mandamus to Compel Agency Action Unlawfully Withheld or Unreasonably Delayed**

---


April 17, 2025                    Stephen C. Leckar
                                  Kalbian Hagerty LLP
                                  888-17th St., NW, Twelfth Floor
                                  Washington, DC 20006
                                  (202) 223-5600
                                  sleckar@kalbianhagerty.com

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), undersigned counsel certify that:

## A.    Parties and Amici

The parties in this case are Petitioner, SI Wireless, LLC ("SI"), a Limited Liability Corporation organized under the laws of Illinois, and Respondent, Federal Communications Commission ("FCC"), an independent agency of the United States.

Counsel for Petitioner are not aware of any *amici.*

## B.    Rulings Under Review

There is no agency ruling below.  The instant Petition for Mandamus seeks to require the FCC to take action that is being unlawfully withheld or unreasonably delayed by the agency.  On March 12, 2025, Petitioner filed before the FCC an Application to Compel Agency Action Unlawfully Delayed and Vacate Funding Freeze.  The FCC has taken no action on this.

## C.    Related Cases

This case has not previously been before this Court or any other court.

Petitioner is not aware of any other related cases pending before this or any other court.

# Table of Contents

**Table of Authorities** ........................................................................ iii

**Glossary** .......................................................................................... vii

**Jurisdiction and Relief Sought** ...................................................... 2

**Issues Presented** ............................................................................. 3

**Statement of Facts** .......................................................................... 6

I.    SI was an established provider of advanced communications services ..... 7

II.   The FCC urged providers with Huawei equipment to participate in the SCRP and made no demands for normal service and cash flow ............... 8

     A.    The FCC "applauded" providers for removing Huawei equipment ahead of the program start and never demanded any level of customer service ........................................... 8

     B.    SI's business plan disclosed its then-current reduced customer base and its intent to remove and rebuild its system ............................. 11

     C.    Greatly diminished funding and delays in the Program's administration drastically affected SI's plan and operations ......... 13

     D.    Despite being affected by Program-wide dysfunctions and receiving no operating funds for three years, SI has materially accomplished much of its approved construction. Yet it remains unpaid for work invoiced years ago ................................................ 16

        III. SI's customer base was sufficient at all relevant times ........... 19

        IV. The freeze's timing, coupled with the CFO's brandishing the POST story and mischaracterizing Mr. Williams' statements, when coupled with and the Enforcement probe's overbreadth, reflect retaliation for SI's whistleblowing ................................. 21

V.    The FCC's inaction also harms the public interest ................................. 26

i

**Reasons Why the Writ Should Issue** ....................................................................27

**Summary of Argument** ................................................................................28

**Argument** .......................................................................................................30

          I.     **The governing statute** .......................................................30

          II.    **The TRAC standards**....................................................31

          III.   **Applying the *TRAC* standards to the facts** .....................32

          IV.   **Relief Sought** ...................................................................40

**Certificate of Compliance**........................................................................41

## Cases

*Air Line Pilots Ass'n v. Civ. Aeronautics Bd.*,
    750 F.2d 81 (D.C. Cir. 1984) ........................................................................ 32

*\*Am. Hospital Association v. Burwell*,
    812 F.3d 183 (D.C. Cir. 2016) .............................................................30, 31, 32

*FEC v. Rose*,
    806 F.2d 1081 (D.C. Cir. 1986) .....................................................................36

*In re Am. Rivers & Idaho Rivers United*,
    372 F.3d 413 (D.C. Cir. 2004) ......................................................................33

*In re Barr Laboratories, Inc.*,
    930 F.2d 72 (D.C. Cir. 1991) ........................................................................38

*\*In re Core Communications, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008) ...................................... 30, 31, 32, 33, 35, 40

*\*In re Monroe Communications Corp.*,
    840 F.2d 942 (D.C. Cir. 1988) .............................................................32, 36, 39

*In re United Mine Workers of America International Union*,
    190 F.3d 545 (D.C. Cir. 1999) ......................................................................40

*In the Matter of Sponsorship Identification Requirements for Foreign Government-Provided Programming*,
    36 FCC Rcd. 7702 (2021) .............................................................................21

*Lake Region Healthcare Corp. v. Becerra*,
    113 F.4th 1002 (D.C. Cir. 2024) ....................................................................19

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ..................................................................................19

*Mashpee Wampanoag Tribal Council v. Norton*,
    336 F.3d 1094 (D.C. Cir. 2003) ...............................................................33, 37

*MCI Telecomms. Corp. v. FCC,*
  627 F.2d 322 (D.C. Cir.1980) ....................................................33

*Midwest Gas Users Ass'n v. FERC,*
  833 F.2d 341 (D.C. Cir.1987) ....................................................33

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) ............................................................30, 31

*RKO General, Inc. v. FCC,*
  670 F. 2d 215 (D.C. Cir. 1981) .................................................21

*Sierra Club v. Thomas,*
  828 F.2d 783 (D.C. Cir. 1987).................................................37

*\*Telecommunications Research & Action Center v. FCC,*
  750 F.2d 70 (D.C. Cir. 1984) ...........................3, 31, 32, 33, 35, 36, 37, 38

## Statutes

5 U.S.C. § 555(b) ....................................................................30

5 U.S.C. § 706(1) ..................................................................3, 30

5 U.S.C. §1603(d)(6)(A)-(C) ......................................................5

28 U.S.C. § 1651(a) ..............................................................3, 30

47 U.S.C. § 153(2) ..................................................................20

47 U.S.C. § 1608(10) ................................................................6

47 U.S.C. § 1601 ..................................................................8, 33

47 U.S.C. § 1601(b)-(c) ...........................................................36

47 U.S.C. §1603(b)(1) .............................................................20

47 U.S.C. § 1603(d)(5)(A) ........................................................36

47 U.S.C. § 1603(d)(6) ............................................................35

47 U.S.C. § 1603(e)(3)(A)-(B) ...................................................28

47 U.S.C. §1608(6)(A)-(B) ......................................................20

47 U.S.C. §1609..................................................................33

## Other Authorities

Eva Dou, Funding Shortfall for New Tech Endangers Rural Cell Service, FCC Says, WASHINGTON POST (May 2, 2024) (https://www.washingtonpost.com/technology/2024/05/02/huawei-rip-remove-order-threatens-service/) ..........................................................................4

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd 11423 (2019)............................6

Secure and Trusted Communications Networks Act of 2019 (116th Cong., 1st Sess., Dec. 16, 2019) ..........................................................................8

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs,* Second Report and Order at pp. 2-15, WC Docket No. 18-89, 35 FCC Rcd (Dec. 11, 2020) ("Second Report") (https://docs.fcc.gov/public/attachments/FCC-20-176A1_Rcd.pdf ) ......................8

*FCC Announces a Webinar for the Secure and Trusted Communications Networks Reimbursement Program*, DA 21-1164 (Sept. 16, 2011) ........................................9

(https://youtu.be/9cFEeHgMYgo (webinar); https://www.fcc.gov/news-events/events/2021/09/secure-and-trusted-communications-networks-reimbursement-program-webinar) ..........................................................................10

FCC Public Notice DA 24-1279 (Dec. 26, 2024) (DA-24-1279A1.pdf) ...............13

Fourth Report, at p. 9 (https://docs.fcc.gov/public/attachments/DOC-403626A1.pdf.) ..........................................................................16

Mike Dano, *The Huawei 'rip and replace' program is a mess, argues SI Wireless*, LIGHT READING (Oct. 18, 2023). (https://www.lightreading.com/security/the-huawei-rip-and-replace-program-is-a-mess-argues-si-wireless) ...........................21

(https://www.sec.gov/newsroom/press-releases/2022-114) ...................26

*Eighteenth Section 706 Report and Notice of Inquiry*, GN Docket No. 24-214 at 2, (Sept. 6, 2024) ..........................................................................................27

*Closing the Digital Divide for the Millions of Americans without Broadband* (Feb. 1, 2023) (https://www.gao.gov/blog/closing-digital-divide-millions-americans-without-broadband)..................................................................................27

https://www.fcc.gov/sites/default/files/ACP-FAQs-Post-ACP-Ending.pdf............36

# Glossary

CFO-Chief Financial Officer


EB-Enforcement Bureau


FCC--Federal Communications Commission


SCRP-Secure and Trusted Communications Program


SI- SI Wireless, LLC


Williams-Leslie Williams

**In re SI WIRELESS, LLC**

> **v.**

**FEDERAL COMMUNICATIONS COMMISSION**

**Petition for Mandamus to Compel Agency Action Unlawfully Withheld or Unreasonably Delayed**

Petitioner SI Wireless, LLC ("SI") is a small wireless broadband provider that has historically served rural Southern Illinois, Tennessee and Kentucky. It participates in the FCC's Secure and Trusted Communications Networks Act's Reimbursement Program ("SCRP"). Congress created the SCRP in 2020 to underwrite speedily removing Chinese-made equipment from American networks. SI accepted that challenge and the FCC then approved SI's business plan.

The FCC underestimated the response to the program and only 39% of funding was allocated. SI submitted an approved plan to survive on less than half the budget. Even so, the FCC's payments proved haphazard and paltry.

In May 2024, the WASHINGTON POST described SI's experience in the Program as exemplifying how waste and mismanagement had stifled SI and other participants' progress and reimbursements. In early July, the FCC's Chief

Financial Officer ("CFO") cited that article and froze SI's reimbursements. At that point, SI had been reimbursed for less than 14% of the work it had undertaken.

In addition, the FCC's Enforcement Bureau ("EB") concurrently initiated an investigation of the firm. To call that probe granular would be an understatement.

The FCC has never alleged a legally cognizable theory for its actions. Everything lingers while SI is owed over $47 million with invoices that are two years old. SI's twice-approved plans entail ripping and then restoring its network, so it can't derive interim customer income. SI doesn't receive subsidies from the federal Universal Service Fund ("USF"), either. Hence, the FCC's abrupt and protracted stoppage of reimbursements and microscopic examination inflicts severe financial damage on a business executing critical infrastructure work in support of a national security mandate.

The FCC should be directed to decide promptly whether to end the freeze. The Court also should retain jurisdiction over the case.

## Jurisdiction and Relief Sought

On March 12th, SI filed with the FCC an Application to Compel Agency Action Unlawfully Delayed ("Application").[1] The FCC did not respond within the thirty days that SI requested that it decide to vacate the freeze.[2] SI seeks a writ of

---

[1]  (App'x:001-027) (Application); (App'x:0028-023) (accompanying exhibits).

[2]  (App'x:026).

mandamus under the All Writs Act[3] to "compel agency action unlawfully withheld or unreasonably delayed."[4] The administrative delay has become "so egregious as to warrant mandamus."[5]

## Issues Presented

SI's principal, Leslie Williams ("Williams"), told the POST how the FCC's deficient administration had withheld SI's payments and had caused large gaps in customer service nationwide. His revelations presaged deficiencies that the FCC later admitted in subsequent Reports to Congress about the SCRP.[6]

---

[3] 28 U.S.C. § 1651(a).

[4] 5 U.S.C. § 706(1) (Administrative Procedure Act ("APA")).

[5] *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("*TRAC*").

[6] Wireline Competition Bureau, *Secure and Trusted Communications Networks Reimbursement Program Fourth Report to Congress* at 9, WC Docket No. 18-89 (July 1, 2024) ("Fourth Report"), https://docs.fcc.gov/public/attachments/DOC-403626A1.pdf.); Wireline Competition Bureau, *Secure and Trusted Communications Networks Reimbursement Program Fifth Report to Congress*, at 13-14 (Dec. 30, 2024) ("Fifth Report"), https://docs.fcc.gov/public/attachments/DOC-408520A1.pdf).

Mr. Williams' revelations came at a price.  The CFO cited the POST article as a catalyst in its decision to freeze SI's payments.[7]  And the EB's interrogatories and document requests, when disaggregated into subparts, posed thousands of demands to a small business.[8]

The CFO and EB posited that SCRP participants must maintain "normal" service to an active paying customer base and generate "normal" cash flow (whatever "normal" means) even after removing the network needed to serve those customers. Last September SI challenged this theory as legally meritless and motivated by a desire to suppress honest criticism.  SI nonetheless provided full sworn responses and the informational equivalent of about 84 sets of the ENCYCLOPEDIA BRITANNICA.[9]

Subsequently, SI sent further information to the EB and Mr. Williams voluntarily met with its staff (three lawyers and an investigator) during

---

[7]  (App'x:030-033) (citing Eva Dou, Funding Shortfall for New Tech Endangers Rural Cell Service, FCC Says, WASHINGTON POST (May 2, 2024) (https://www.washingtonpost.com/technology/2024/05/02/huawei-rip-remove-order-threatens-service/). (App'x:031, 254-258). The CFO cc'd a virtual who's-who of the agency's then-uppermost staff. (App'x:033).

[8]  Letter from Meghan Ingrisano, Chief, Enforcement Bureau Fraud Div'n-Leslie Williams (July 11, 2024) (App'x:035-051).

[9]  Letter from Stephen Leckar-John Corbin, Esq. (EB) & Dan Daly, Esq. (CFO) (Sept. 17, 2024) & Declaration of Leslie Williams (App'x:053-144) (excerpts).

Thanksgiving week.   SI answered several further requests for information last December.[10]   Yet the freeze and probe continue.  Nobody at the FCC will say why.

Such temporizing is unreasonable. Congress determined that Huawei equipment posed an immediate national security risk, and the public interest lay in reimbursing providers who under FCC-approved plans promptly removed, destroyed and replaced those materials with untainted equipment.  SI responded to that call, understanding that it was expected to accomplish this work in a year, absent extensions for good cause.[11]  That expectation proved illusory.  SI found its invoices pigeonholed and its reimbursements faltering long before its pipeline abruptly froze.

---

[10]  SI supplemented its response to the EB and CFO on September 25 and November 7, 2024. (App'x:146-147, 149-151). On November 19th, SI informed EB how the company's quarterly "Status Updates" reflected the FCC's seeming inability to appreciate SI's business plan and shortfalls in the SCRP. (App'x:153-209).  After Mr. Williams' appearance, SI answered the EB's follow-up questions and offered further observations on December 13th. (App'x:211-216). On December 20th and December 23rd, SI answered the EB's request for more information. (App'x:218-220, 222-223).  On December 23rd, SI explained to the CFO how the freeze harms competition in the market. (App'x:225-229).

[11]   47 U.S.C. §§ 1601, 1603(d)(6)(A)-(C).

The question presented is whether the FCC's continued delay, preventing a small company from finishing construction of a network in an underserved market and receiving cash flow, requires judicial interposition.

## Statement of Facts

SI's Application outlined its history as a "provider of advanced communications services"[12] and explained how the FCC had exhorted it and other carriers to participate in the SCRP.[13]

In addition to having reliance interests, SI explained that no legal basis requires paying customers on a temporarily ripped-out network—which makes no sense—and that it had sufficient customers to participate in the SCRP.

---

[12] 47 U.S.C. § 1608(10) (definitions).

[13] In 2018, SI had been one of seven carriers whose estimates prompted the FCC to recognize that "the impact of a rip-and-replace requirement is large compared with similarly situated non-reporting carriers." *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd 11423, ¶ 114 (2019).

I.  SI was an established provider of advanced communications services.

SI had a historic customer base of about 30,000. In May 2019 it had nearly eleven thousand customers.[14]  It depended on revenues from those customers and didn't receive USF subsidies.[15]

SI, like many of its counterparts, relied on Huawei equipment. Once that presence became a national defense concern, SI tracked proposals before Congress and the FCC to fund this equipment's removal.[16]  Just after the SCRP's enactment, SI provided the FCC a statement of interest to participate in the program.[17]

In 2020, SI transitioned 3000 customers to another carrier.  Afterwards SI began removing its Huawei equipment in anticipation of the Program's establishment, which the FCC proclaimed as imminent.[18]

---

[14]  (App'x:003-004,18, 065; 087).

[15]  (App'x:004, 055).  Greatly simplified, the USF provides participating providers funding through programs enhancing broadband connectivity in rural and low-income markets.  *See* (https://www.usac.org/).

[16]  (App'x:007, 056).

[17]  (App'x:007).

[18]  (App'x:018, 056-057).

II. The FCC urged providers with Huawei equipment to participate in the SCRP and made no demands for normal service and cash flow.

Earlier SI observed that "normal business operations and cash flow" is a misnomer. Ripping and replacing a functioning network isn't "normal" and the legislative history, statute and FCC regulations don't demand a "normal" operation or cash flow for SCRP support.[19]

The Staff's musing is inconsistent with the circumstances surrounding the SCRP's creation. And the Staff has overlooked the agency's contemporaneous behavior. The FCC encouraged SI and other providers to participate quickly and never demanded paying customers nor any prescribed customer service during the transition process. The agency cannot create retroactive eligibility criteria.

A. The FCC "applauded" providers for removing Huawei equipment ahead of the program start and never demanded any level of customer service.

SI's January 2022 SCRP application followed its studying the FCC's December 2020 Second Report, attending an FCC webinar, and receiving its lawyer's conveying the Staff's confirmation that providers who remediated before

---

[19] H.R. Rep. 116-352, "Secure and Trusted Communications Networks Act of 2019" (116th Cong., 1st Sess., Dec. 16, 2019); 165 CONG. REC. H.1022-10286 (Dec. 16, 2019); 47 U.S.C. § 1601 *et seq*; *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs,* Second Report and Order at pp. 2-15, WC Docket No. 18-89, 35 FCC Rcd (Dec. 11, 2020) ("Second Report") (https://docs.fcc.gov/public/attachments/FCC-20-176A1_Rcd.pdf ).

the program's start would be reimbursed their reasonable expenses. These assurances convinced SI that an early start would allow it to remove and replace the Huawei equipment and resume wireless service to its customers quickly.

1. SI knew that the FCC was encouraging providers to begin renovating before Congress approved appropriations. For instance, in December 2020 the FCC "applauded" providers' "proactively taking steps to increase the security of their networks" and promised that "we will allow providers to obtain reimbursement for costs reasonably incurred prior to the creation and funding of the Reimbursement Program …."[20]

2. Uppermost-level FCC staff followed suit. Mr. Williams observed a September 2021 webinar where the Wireline Competition Bureau's heads recognized that providers faced a "complex task" and admitted that "this will not be simple …. "[21]

In that webinar the Staff recognized—in words pertinent here—that "in some cases this will mean starting over from scratch" but exhorted providers to

---

[20] Second Report at ¶ 130 (App'x:009, 057). Mr. Williams is a Certified Project Manager active in the telecommunications industry since 2004. (App'x:057).

[21] Public Notice, *FCC Announces a Webinar for the Secure and Trusted Communications Networks Reimbursement Program*, DA 21-1164 (Sept. 16, 2011); (Appx:009,058). A similar message was delivered at a February 2021 webinar before the Rural Wireless Association ("RWA"). (App'x:231).

"make no mistake—the time is now to remove this equipment from our networks ….."[22]

1. Swift reimbursement also was held out: "We understand that many of these carriers are small carriers that may not have the resources to float paying all these expenses while they wait to be reimbursed."[23]

2. The FCC's urgency was reinforced directly. As SI informed the EB and CFO, it had been concerned with accelerating removing its Huawei equipment but not recovering the outlay. In mid-September 2021, SI sought to confirm that it was ripping its network at the right time. Its regulatory counsel informed its Project Manager: "I just spoke to the FCC. As long as you have everything documented and can show that the equipment has been rendered unusable and that no

---

[22] (App'x:009-010, 058) (https://youtu.be/9cFEeHgMYgo (webinar); https://www.fcc.gov/news-events/events/2021/09/secure-and-trusted-communications-networks-reimbursement-program-webinar) and Tr., pp. 1) (remarks of Bureau Chief Harkrader). The theme of exigency was overarching. *See id.* at 5 ("you can also start going ahead now; there's no need to wait to compile vendor quotes, invoices and other documentation") (App'x:010, 058).

[23] (App'x:010, 058) (remarks of Acting Associate Bureau Chief Faulb).

data is accessible (and that it is destroyed here and not overseas) then you should be good to go."[24]

Despite these green lights, which SI followed, the CFO and EB have forgotten the FCC's prior stance. The agency, from Commissioners to Bureau heads, asked for networks to be removed speedily, and knew or must have known that could temporarily result in no or at best limited customer service and revenues.

B.    SI's business plans disclosed its then-current reduced customer base and its intent to remove and rebuild its system

Primed by the FCC's pledges, SI devoted its efforts to shedding its Huawei equipment before the program's inception and replacing its network with approved materials within the then-expected one-year period.

SI's first submission, which the FCC approved, laid out its rip-and-then-replace goals.

1. SI stated that it "ha[d] begun the de-installation of its [Huawei] equipment and expect[ed] to have the de-installation, destruction and recycling completed by the time it receives its first reimbursement from allocation."[25]

---

[24]  (App'x:010, 058-059).  SI's lawyer also represented the Competitive Carriers Association and RWA. (App'x:059).

[25]  (App'x:011, 060).

2. SI advised that its "Form 477 [quarterly report] shows only a small group of subscribers as services were transitioned for most of our customers to other providers in late December 2019/early 2020 after it became apparent that the federal government would undertake this [remediation] program and after Sprint terminated the Company's roaming [affiliation] due to Sprint's impending sale to T-Mobile…."[26] (T-Mobile had committed to excluding Huawei from its network.)

Although the Staff has questioned SI's eligibility for the SCRP, SI never ceased being a "provider of advanced communications services" nor sought to exit the industry. (One might consider a professional baseball pitcher sidelined by Tommy John surgery. He has not abandoned his occupation while recovering.)

Here, SI wrote the Staff (and later, the FCC) that it always was an advanced communications provider, remained one while removing and replacing its infrastructure at the Government's request, and remains one today, having resumed services to a segment of its intended customer base and the wholesale service it has been providing to its affiliate, Rural Connect ("RC"), which provides that to its customers. When the FCC's funding constraints are lifted, SI can finish its work.[27]

---

[26] App'x:011-012, 060).

[27] (App'x:012, 060).

C. <u>Greatly diminished funding and delays in the Program's administration drastically affected SI's plan and operations</u>.

The FCC greatly underestimated the SCRP's cost, initially claiming that the $1.9 Billion appropriated in 2020 would be sufficient. However, because the FCC wanted providers to use its standard cost catalog, that estimate skyrocketed. Ultimately the FCC sought $5.6 billion, which took four years to secure.[28]

Meanwhile participants were allocated only 39.5% of the funds originally awarded, with no assurance of additional funds. Having removed its network when asked, SI could not use the partial funding to rebuild a replacement network alongside its old one. Hence it could neither earn revenues nor, unlike many cohorts, receive USF subsidies during its renovation, as SI lacked a network.

To remain financially viable while fulfilling commitments to its customers and vendors, SI modified its business plan. It opted for fixed wireless service over 100-plus sites instead of full mobility over a 204-site network, pending full funding.[29]

The FCC approved SI's December 2022 modified plan, which confirmed that SI had "follow[ed] the original proposal which involved the Company first

---

[28]  FCC Public Notice DA 24-1279 (Dec. 26, 2024) ([DA-24-1279A1.pdf](DA-24-1279A1.pdf)); (App'x:059) (explaining that the catalog likely contributed to cost inflation).

[29]  SI's successful $181 million proposal became $71 million.

temporarily transitioning customers to other networks, then disassembling its existing network, and then bringing up the replacement network, restoring former customers and adding new customers to a modernized network."[30] SI explained:

1. "[T]he decommissioning work is substantially accomplished and SIW has made substantial reimbursement requests so that it can pay costs associated with the decommissioning and destruction process. The delay in processing these invoices exceeds 5 months in some cases and has put SIW in peril with its vendors because it has not been able to make timely payments for the completed work and is beginning to lose credibility with its vendors who will not continue to do the work needed to complete the project."[31] (This delay soon became commonplace.)

2. SI reaffirmed transitioning most of its customers to other carriers to "offer[] them continuity of services …[and to have] cut nearly all of [its] revenue sources. Meanwhile, expenses associated with the network [during its replacement] with much fewer customers are still being incurred."[32]

---

[30] (App'x:013, 061).

[31] (App'x:013-014, 061-062).

[32] (App'x:014, 062).

3. SI clarified that its "plan revision [] is going from mobility to fixed wireless and then layering in mobility if, and when, additional funding and/or national carrier affiliation becomes available…."[33]

SI's again advising that while rehabilitating the network it would not be offering normal service sent an unambiguous message inconsistent with the Staff's belief that providers must maintain ordinary customer service. SI's disclosures triggered no contemporaneous official angst. Nor should they have. SI's twice disclosed what it was pursuing and how it intended to get the work done.

SI's contemporaneous expectations are illustrated by its October 2022 Quarterly "SCRP-5640" report, which advised the FCC that:

> Our company has chosen to no[t] hot cut but rather to move subs, take down and redeploy the network. We are a small business without extensive funding and it[']s essential that we be able to complete this job in a short time frame as all our incoming cash flow has been turned off for this process and to date none brought in from reimbursements. We are living on vendor goodwill from past deployments we have done but that will not last forever.[34]

In January 2023, SI reminded the FCC that "[u]nlike some of the other applicants, SIW has been able to migrate its customer base to another network while the equipment is being replaced rather than build a new network and then

---

[33] *See id*.

[34] (App'x:163).

migrate customers to it. SIW has been able to proceed at a much quicker pace as a result[] but is now stuck because it has not been reimbursed for its efforts thus far."[35]

The FCC never objected that SI's process was improper or was deviating from its approved plan, let alone contest its demolition or reconstruction.

D. <u>Despite being affected by Program-wide dysfunctions and receiving no operating funds for three years, SI has materially accomplished much of its approved construction. Yet it remains unpaid for work invoiced years ago</u>.

SI has installed equipment on 88 replacement sites fully and 14 sites partially, thereby exceeding what its second approved plan envisioned.

SI accomplished this despite the reasons for delays given in the FCC's Fourth and Fifth <u>Reports to Congress</u>, which followed the POST article's publication.  Those transmittals identified the "(1) absence of full funding; (2) supply chain delays; (3) labor shortages; (4) weather-related challenges; and (5) extended review times in the processing of requests for reimbursement" as causing many providers to experience problems.[36]   That beclouds important facts.

---

[35]  (App'x:169).

[36]  (Appx:014-015, 062) (quoting Fourth Report, at p. 9 (https://docs.fcc.gov/public/attachments/DOC-403626A1.pdf.)).

The FCC obscured its role in underfunding the SCRP, which forced early participants such as SI to overhaul their plans. And delays were common because the FCC's policy wouldn't process invoices or modifications when others were pending, even to the point of reneging on the Program Administrator's commitments to get funding expedited.[37]  Thus SI faced a major reimbursement backlog even before the CFO's unexpected freeze.

SI timely alerted the powers-that-be to those issues. Mr. Williams and SI's regulatory counsel spoke with the Staff between the fall of 2022-early 2023, unsuccessfully asking them to examine a marked delay in reimbursements.[38]

SI's quarterly reports are informative.[39]  For instance, its July 2023 Report stated: "Some continuity of who is doing the reviews combined with some channels for communication above is needed especially for companies like ours that have started earlier than others and are going about this in a different order (ie [*sic*] ripping then replacing instead of a simultaneous process). We have invited those reviewing our project to the market to gain an understanding of each others['] needs to get through this together in the easiest manner…."[40]

---

[37]  (App'x:015, 062-063).

[38]  (App'x:015, 063).  Even then, SI was battling payment lag. *Infra* p. 18.

[39]  (App'x:015; 153-158, 159-209) (Form 5640 reports).

[40]  (App'x:185).

SI's entreaties fell on deaf ears. The delays and freeze's impact on SI are depicted below, adding the month since SI's Application's filing:

| Category | Count | Amount | Days Waiting | Additional Info |
|---|---|---|---|---|
| Invoices Awaiting Reimbursement Approval | 271 | $14,681,310.58 | — | — |
| Oldest Invoice Awaiting Reimbursement Approval | — | — | 907 | Submitted on 10/19/22 |
| Number of Modifications | 6 | — | — | — |
| Days Awaiting Modification Approval or Denial | — | $32,656,228.22 | 635 | Requires action on modification for submission |
| Invoices Awaiting Reimbursement Over 365 Days | 203 | $12,176,785.72 | — | — |
| Invoices Awaiting Reimbursement Over 18 Months | 152 | $7,920,011.40 | — | — |
| Invoices Awaiting Reimbursement Over 24 Months | 10 | $588,644.50 | — | — |
| Invoices in "Submitted" Status (Unaddressed) | 145 | $6,890,842.06 | — | — |
| Oldest Invoice in Submitted Status | — | — | 649 | — |

The Program was supposed to fund ripping and replacing Huawei equipment deemed antithetical to the Nation's defense. SI embraced the SCRP but can neither get paid the over $47 million owed it, nor get the FCC to act.

III.   <u>SI's customer base was sufficient at all relevant times</u>.

To bolster their notion that a SCRP provider must have a "normal" business the Staff conjured a theory that an active paying customer base was necessary during network replacement. However, as SI observed, the statute is not ambiguous as it lacks such a condition, and the Staff's revisionist interpretation would command no deference in any event.[41]

In addition to reasonably relying on the FCC's prior written and oral commitments, SI explained that it always had a customer base:

> (i)  Neither the statute, legislative history, nor FCC rules require a provider to have active customers—or to generate cash flow—during network replacement. The FCC's January 10, 2023, Report to Congress outlines required elements such as cost estimates, equipment details, timelines, and certifications, but does not reference customer metrics.[42]

> (ii)  Even if the timing of customer status were relevant—which it is not—SI had several thousand customers in 2019–2020 when it first expressed interest in the SCRP.[43]

---

[41]  (App'x:017, 072-073) (citing *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024); *Lake Region Healthcare Corp. v. Becerra,* 113 F.4th 1002, 1007 (D.C. Cir. 2024) (granting petition for review)).

[42]  (App'x:017,146).

[43]  (App'x:018, 056, 065).

(iii) The statute only requires under 2 million customers and SI always was under that ceiling.[44]

(iv) Had customers been required as of the SCRP application's submittal SI would qualify. SI had retained a very small group of customers and provided the EB with the underlying agreements.[45] And the Act deems a provider's Affiliates and its customers to be customers of that provider.[46] Mr. Williams since September 2021 held (and holds) a directorship and the position of Interim General Manager of Rural Connect ("RC"), a provider with a discrete customer base. He also bought 41% of RC in June 2022.[47] Because he exercises control of RC (and his ownership interest in RC exceeds 10%), RC is an "Affiliate" of SI.[48] RC takes wholesale service from SI, and had over 1200 customers as of January 2022, when SI applied for the SCRP.[49]

---

[44] *Id.*

[45] (App'x:019, 60, 62, 65-66).

[46] 47 U.S.C. §§ 1603(b)(1) (eligibility), 1608(6)(A)-(B) (defining "customer").

[47] (App'x:019, 070-072).

[48] 47 U.S.C. § 153(2).

[49] (App'x:019, 021, 066-067). Several other customers received service from SI, as its business plans stated. (*supra* pp. 12, 14).

(vi)  Nothing in the Act requires that customers generate interim cash flow. Nor does the statute or FCC precedent prohibit barter transactions, such as SI's accessing RC's towers in return for providing RC wireless service.[50]

In all respects, SI met the statutory eligibility framework and reasonably relied on the FCC's commitments and guidance.

IV.  <u>The freeze's timing, coupled with the CFO's brandishing the POST story and mischaracterizing Mr. Williams' statements, when coupled with and the Enforcement probe's overbreadth, reflect retaliation for SI's whistleblowing</u>.

By the time the POST article appeared Mr. Williams had spoken privately to the Staff and commented frequently in trade publications when asked about deficits with the Program's funding and administration.[51]

In May 2024, shortly after the article's publication, the FCC's Wireline Competition Bureau sent SI a Request for Information ("RFI"), citing concern—

---

[50]  (App'x:019, 066); (App:218-219). FCC cases approving barter arrangements include *RKO General, Inc. v. FCC*, 670 F. 2d 215, 226 & n.31(D.C. Cir. 1981); *In the Matter of Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 36 FCC Rcd. 7702, 7717 & n. 91 (2021).

[51]  (App'x:020, 066) (citing Mike Dano, *The Huawei 'rip and replace' program is a mess, argues SI Wireless*, LIGHT READING (Oct. 18, 2023). (https://www.lightreading.com/security/the-huawei-rip-and-replace-program-is-a-mess-argues-si-wireless)); *See also* (App'x:027) (Addendum; listing articles).

purportedly based on the article—that SI lacked active customers. But when the staff followed up afterwards, their question shifted to whether SI was earning revenue from advanced communications services.

The POST article—later to be cited in the FCC's July freeze notice— accurately described SI's dismantling and rebuilding under approved plans. Although the story mentioned rural service gaps, it never claimed SI had no customers. In fact, SI maintained active customers: serving contractors on-site and providing wholesale service to Rural Connect, which had 81 active customers on SI Wireless network, as well as a few other subscribers.[52]

When asked about revenue, Mr. Williams referred the Bureau to Rural Connect, which he controls and which obtains wholesale service from SI[53]

SI protested to the FCC that the freeze, coming shortly after the POST story broke, the CFO's misreading of that article, the newly-professed wonderment that SI lacked "normal" business, and the Staff's misunderstanding Mr. Williams' response to the Bureau, was so unjustified as to suggest a retaliatory motivation.

---

[52]  (App'x:020-021, 067, 070-072), 218).

[53]  (App'x:054, 067).

The EB's RFIs are so extraordinarily prolix and unrelated to its ostensible concern with having customers that they corroborate SI's theory of retaliation. As an example, EB RFI 31 demanded:

Describe the business relationships between and among the Company and any of its parents, subsidiaries, members, and associates.[10] Your description must identify all functions or services each person or entity performs and the entity for whom it performs such functions or services (e.g., an intermediate holding company that performs no functions, holds or manages assets such as leases office space, is a contracting party, performs responsible organization functions for affiliates, oversees finances such as keeping accounts, is the named entity on bank accounts, performs billing and collection, provides management functions, etc.). The Company's response must specifically state whether the Company or any of its owners or management (including managers, members, officers, or directors) have at any time had any relationship with these persons or entities. For any identified relationship, provide the following information:

a. Explain the nature of and relevant dates associated with the relationship.

b. Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a direct or indirect ownership interest in the Company, and any other affiliated person or entity.

c. A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity.

d. A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity.

e. A description of any shared financial assets and obligations including banking and credit accounts, and tax filings.[54]

---

[54] (Appx:022).

How such minutiae shows whether SI qualified for the SCRP is hard to discern.

Added to that headscratcher, RFI 31 defined "associates" to mean:

> This list includes, but may not be limited to: Leslie Williams; Eric Steinmann; Linda George; Amy McFarling; Chuck Roberts; Dave Sikut; Dogan Koslu; Greg Belknap; Jacquie Cossey; Jason Holliday; Jeffrey Sikut; Joseph Clark; John Hehman; Kenneth Nickerson; Paula Nowell; Phillip Comer; Ray Harvey; Thomas Karnes; Tom Sams; Troy Bruce; Integrated Business Networks, LLC; Clear 9 Communications, LLC; ESIRF LLC; Flat Wireless LLC; Minghelli LLC; NTCH-West Tenn Inc.; NTCH-NM, LLC; PTA-FLA Inc.; Rural Connect LLC; Z Best Logistics, LLC; Sikut, Inc.; Business Solutions, LLC; Hardrock Enterprises, LLC; MiTawn Services; Koslu LLC; Sparqworx; MLC Strategies, LLC; Fisher Telecommunications; Tower Engineering Solutions, LLC; Barrett Browning, LLC; Partner Engineering & Science, Inc.; Marahute Mechanics; Solano Communications, LLC; World Tower; Socratica Consulting, LLC; Good Works Digital, LLC; Greywolves; Flat Wireless.[55]

RFI 32 also demanded about dozens of independent vendors:

---

[55] (App'x:023) (citing App'x:067); *See also* (App'x:102-135) (SI's response).

Provide a chart for each company identified in response to Inquiry 31, including any additional companies you identify in response to Inquiry 33 (collectively, including the Company, the "Associated Companies," and each one singularly an "Associated Company"). Each chart must: show the internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility); specify the names of all owners (and percentage of ownership or membership interest); identify all directors or board members (including addresses and telephone numbers); identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity); and identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual.[56]

Such excessive and overly detailed demands—many appearing unrelated to the investigation's purpose of verifying customer status at the time of application—would challenge any business, especially a small firm asked to map out the internal structures of independent contractors it doesn't control. To SI's knowledge no other program participant has been required to provide such overwhelming detailed information about its business relationships.

---

[56] (App'x:042). The RFI defined "'The Company' [to] mean[] (a) SI Wireless, LLC, irrespective of the names under which it has done business; (b) all of its predecessors, subsidiaries, affiliates, branches, divisions, groups, operations, units, parent organizations, plants, and any joint ventures of which it is a part – including, but not limited to, Integrated Business Networks, LLC; and (c) each of the present or former officers, directors, employees, agents, and representatives of SI Wireless, LLC." (App'x:049).

SI lodged objections to the demands' overall undue burdensomeness (twenty

subparts for each of the named thirty-three entities alone comprised 660 subparts),

their questionable relevancy and in some cases, unintelligibility. SI nevertheless

responded to the best of its ability. The FCC never claimed its answers were

deficient. Yet seven months later the freeze remains. Meanwhile the FCC has

evaded SI's Freedom of Information Act requests filed last October seeking Staff

members' communications with the Program Administrator and among themselves

concerning SI's plans, payment requests, and Mr. Williams' statements to the

media.[57]

V.   The FCC's inaction also harms the public interest.

The Agency's dawdling disserves the public interest.

Removing Huawei equipment is of public concern.[58]

And so is SI's underserved rural market. The FCC recognizes that "[i]n the

post-pandemic era, broadband has become indispensable to every aspect of modern

---

[57]  (App'x:234-245, 244-245, 249-251). On March 6, 2025, the FCC disclosed
paying Ernest & Young, the Program Administrator, $14.9 million between FY
2022-FY 2024. (In June 2022 E&Y paid the SEC $100 million for systematic
cheating on ethics exams. (https://www.sec.gov/newsroom/press-releases/2022-
114)).

[58]  *See* 47 U.S.C. § 1601.

life."[59] And as SI urged below, the sooner the FCC addresses this matter, the sooner consumers in the rural market segments which SI historically served will benefit from competitive cost, innovation, and customer care.[60]  SI's price points are expected to be a quarter to one-half of the rates charged by the dominant major carriers, who typically receive government subsidies.[61]

## Reasons Why the Writ Should Issue

Neither the statute nor regulations condition SCRP eligibility on customer metrics, defines when customers must be counted, if at all, nor demand that customers be paying.  SI presented proof of compliance with the law and that its SCRP application and business plans were accurate.

Moreover, the FCC cannot retaliate against entities who provide honest information about programmatic problems.  The circumstances which SI has described evince such untoward conduct occurring.

Even if the CFO's freeze and the EB investigation were validly undertaken the FCC must decide within a reasonable time whether those actions justifiably

---

[59]  *Eighteenth Section 706 Report and Notice of Inquiry*, GN Docket No. 24-214 at 2, ¶ 2 (Sept. 6, 2024).

[60]  (Appx:024, 074) (citing General Accounting Office, *Closing the Digital Divide for the Millions of Americans without Broadband* (Feb. 1, 2023) (https://www.gao.gov/blog/closing-digital-divide-millions-americans-without-broadband)).

[61]  (App'x:228-229) (SI letter to CFO).

should continue and provide the target proper notice and an opportunity to be heard. The extended delay jeopardizes SI's existence. The FCC should be ordered to decide promptly whether sufficient cause exists to continue the freeze while the Court retains jurisdiction so that the agency cannot use further delay to destroy SI.

## Summary of Argument

SI was a longstanding provider. It relied on the FCC's assurances that providers who expeditiously removed and replaced Huawei materials from their networks would receive SCRP funding. SI informed the FCC that it had transitioned most customers and suspended much service to undertake a rip-and-then-replace program. The FCC twice approved SI's business plans. The firm's quarterly reports regularly disclosed what it was doing and explained that timely payments were necessary to enable it to get the network ripped and replaced and resume operations.

After SI began pointing out that indisputable deficiencies in the SCRP administration were affecting its ability to emerge from this program, the firm's reimbursements began lagging substantially. SI's protests went unanswered, and despite being invited to visit —as directed by Congress—the FCC never conducted field visits to verify that the company's approved plans were being implemented. [62]

---

[62] Congress directed the FCC to conduct audits and field investigations. 47 U.S.C. § 1603(e)(3)(A)-(B).

By early 2024, SI's reimbursements were sparse and sporadic—of alarm to a small firm lacking customer revenues and USF subsidies.  Shortly after the POST featured SI's plight as exemplifying widespread problems in the SCRP, the FCC cited that article to clamp SI's funding and launch an exceptionally intrusive investigation of it.

The FCC's explanations for last July's freeze and investigation reflect recognized hallmarks of retaliation.  These include SI's protected truthful speech, a temporally proximate adverse action invoking questionable legal theories, an unwillingness to recognize prior FCC actions that encouraged SI to participate in the SCRP and approved SI's business plans, a dogged resistance to providing any documents shedding light on its reasons for the actions at issue, and declining a dialogue with the company.

Abundant time has passed for the FCC to decide what to do.  Although Congress expected that SCRP participants' renovation would take a year (absent an extension for good cause), SI enters its fourth SCRP year unable to finish even its abbreviated construction because the FCC has foreclosed its funding.

Such protracted delay disserves Congress' intent and immunizes SI's large rural marketplace from competition in pricing, customer service and innovation. The egregious inaction warrants issuance of a writ of mandamus directing the FCC to issue a judicially reviewable response promptly.

## Argument

### I.    The governing statute

SI seeks relief under the Administrative Procedure Act ("APA") for the FCC's unreasonable delay in deciding these matters.  This theory entails proving that it has "failed to take a discrete agency action that it is required to take."[63] Administrative agencies must decide matters presented to them[64] and federal courts may "compel agency action unlawfully withheld or unreasonably delayed."[65]

Relatedly, SI also seeks relief under the All Writs Act, which empowers courts to issue writs of mandamus to compel agency action unreasonably delayed, where needed to uphold a court's "interest in protecting its future jurisdiction."[66] The plaintiff must "demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists."[67]

---

[63]  *Norton v. S. Utah Wilderness All*., 542 U.S. 55, 64 (2004) (emphasis omitted).

[64]  5 U.S.C. § 555(b).

[65]  5 U.S.C. § 706(1).

[66]  *In re Core Communications, Inc*., 531 F.3d 849, 856 (D.C. Cir. 2008); *TRAC*, 750 F.2d at 75. *See also* 28 U.S.C. § 1651(a).

[67]  *Am. Hospital Association v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (cleaned up).

Review of agency inaction is identical under each theory.[68] The dispositive issue is "'whether the agency's delay is so egregious as to warrant mandamus.'"[69] The statutes "empower[] a court only to compel an agency 'to perform a ministerial or non-discretionary act[ ]' ... without directing how it shall act."[70]

## II.    The *TRAC* standards

"There is 'no per se rule as to how long is too long' to wait for agency action."[71] In *TRAC*, this Court laid out six principles that offer "useful guidance" for analyzing claims of unreasonably delayed agency action.[72]   These are:

---

[68]   *Core Communications*, 531 F.3d at 855.

[69]   *Am. Hosp. Ass'n*, 812 F.3d at 189 (D.C. Cir. 2016) (quoting *In re Core Communications, Inc*., 531 F.3d at 855) (quoting *TRAC* 750 F.2d at 79)).

[70]   *Norton*, 542 U.S. 55, 64 (2004) (emphasis omitted).

[71]   *Norton*, 542 U.S. at 63 (quoting ATT'Y GEN.'S MANUAL ON THE ADMIN. PROC. ACT 108 (1947)); *Core Communications*, 531 F.3d at 855 (cleaned up).

[72]   *TRAC*, 750 F.2d at 80.

(1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.[73]

Those factors "are not 'ironclad,' but rather are intended to provide 'useful guidance in assessing claims of agency delay.'"[74] "'Each case must be analyzed according to its own unique circumstances.'"[75]

### III.   Applying the *TRAC* standards to the facts

The Court should find that the FCC's delay fails the *TRAC* methodology.

---

[73]   *Am. Hosp. Assn*, 812 F.3d at 189 (quoting *TRAC*, 750 F.2d at 80). *See also In re Monroe Communications Corp.*, 840 F.2d 942, 945 (D.C. Cir. 1988) (applying *TRAC*).

[74]   *Core Communications*, 531 F.3d at 855 (quoting *TRAC*, 750 F.2d at 80).

[75]   *Am. Hosp. Ass'n*, 812 F.3d at 189 (quoting *Air Line Pilots Ass'n v. Civ. Aeronautics Bd.*, 750 F.2d 81, 86 (D.C. Cir. 1984)).

**1.** The first *TRAC* factor—that an agency follow "a rule of reason" that justifies its timeline—is the "most important factor."[76] "[A] reasonable time for agency action is typically counted in weeks or months, not years."[77] And in the context of an FCC case, "this court has stated generally that a reasonable time for an agency decision could encompass 'months, occasionally a year or two, but not several years or a decade.'"[78] Whether the FCC satisfies a "rule of reason" depends on "the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency."[79]

SI meets *TRAC*'s first element.

- The "task at hand," as we begin Year 4 of a one-year project, is not complex. The CFO and EB quibble over whether SI had a "normal" operation and cash flow, something required neither by the SCRP[80]

---

[76] *Core Communications*, 531 F.3d at 855.

[77] *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004).

[78] *Midwest Gas Users Ass'n v. FERC*, 833 F.2d 341, 359 (D.C. Cir.1987) (quoting *MCI Telecomms. Corp. v. FCC*, 627 F.2d 322, 340 (D.C. Cir.1980)).

[79] *Mashpee Wampanoag Tribal Council v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003).

[80] 47 U.S.C. §§ 1601-1609.

nor common sense. This is an issue of law, over which the FCC cannot ponder limitlessly.[81]

- The Staff's belief that SI should have had active customers doesn't present an esoteric issue. Again, SI historically had a healthy customer base, migrated most of them after the SCRP's enactment, and with the FCC's encouragement, began ripping and replacing before appropriations, intending to restore full service once its new network was erected. All along, SI had customers, as it disclosed to the FCC.

- SI answered the Staff's reference to whether its SCRP application breached any duty of candor by referring to its approved business plans and Form 5640's, which repeatedly disclosed SI's history, the market dynamics, and SI's intent to remove the Huawei equipment and defer customer revenue while rebuilding and restoring. That the FCC knew this and approved SI's plans undercuts the agency's current posture.

SI also has the better argument over the "significance and permanence of the outcome" and "the agency's resources."

---

[81] *Core Communications*, 531 F.3d at 859.

- The FCC's freeze is existential. It cripples SI's ability to pay vendors and restore full service, after expending massive, borrowed sums to dismantle everything and erect a replacement network. These are significant and permanent consequences, forcing a firm with years of service out of business. (The unending freeze's impact on SI's marketplace is analyzed in SI's discussion of the public interest, *TRAC* Factor Three.) Ironically, having crimped SI's cash flow, the FCC is oblivious to how its delay impeded and then choked SI's earning income.

- The EB assigned three lawyers and at least one investigator to the investigation. It served massive RFIs on SI, which answered them over six months ago. SI never engaged in obstructionism: it promptly fully addressed those questions. And Mr. Williams met voluntarily with EB Staff and provided further documentation afterwards. Yet the FCC, with abundant resources and ample time to evaluate this matter, has ignored the freeze's impact on SI, which heeded the agency's drumbeat to move quickly with remediation, even before any approved program.

**2.** The second *TRAC* factor considers the "statutory scheme [that] may supply content for this rule of reason."[82]  Congress expected that shedding Chinese equipment would be completed within one year from reimbursement funds being distributed, with extensions possible for good cause.[83]  The FCC was tasked with evaluating and approving proper applications, overseeing the reimbursement program (which it handed off to a contractor) and conducting field audits to verify compliance. But for the FCC and its Program Administrator's fitful oversight, followed by the CFO's freeze, SI long ago should have been reimbursed and operational.  It is unreasonable in the extreme for the FCC, having urged SI to act swiftly, to starve its cash flow for years and then suppress funding unendingly.

Moreover, the FCC has failed in its duty to act "equitably" in administering the program.[84]  Providers with parallel networks, who can concurrently rip and replace, are funded.  SI, whose approved plan calls for ripping and then replacing, has faced bewildering bureaucratic impediments.

**3.** Next, *TRAC* evaluates the public interest.  "[A]gency delay is least tolerable" in cases "in which human health and welfare are at stake."[85]

---

[82]  *Core Communications*, 531 F.3d at 855.

[83]  47 U.S.C. § 1603(d)(6).

[84]  47 U.S.C. § 1603(d)(5)(A).

[85]  *FEC v. Rose*, 806 F.2d 1081, 1092 n.17 (D.C. Cir. 1986).

Wireless communications' impact on public welfare, such as the ability to access the internet, transcends any provider's pecuniary interests.[86] The FCC's foot-dragging has left wide swaths of SI's rural marketplace, without efficient lower-cost service competition since the Affordable Connectivity Program ended last June.[87]  Moreover, the SCRP is imbued with national defense considerations. Congress and the Executive branch declared removing Chinese equipment from the nation's broadband networks a "national security" priority.[88]

In any event, the third "factor alone can hardly be considered dispositive when ... virtually the entire [FCC] docket ... involves issues of this type," namely, economic regulation.[89]

**4.**  The fourth *TRAC* factor, "the effect of expediting delayed action on agency activities of a higher or competing priority," cannot be held against SI. Expediting relief for SI Wireless would not disrupt higher-priority agency activities.   To be sure, although relief that would rearrange a "queue" is

---

[86]  *Monroe Communications*, 840 F.2d at 945n.4.

[87]  https://www.fcc.gov/sites/default/files/ACP-FAQs-Post-ACP-Ending.pdf.

[88]  47 U.S.C. § 1601(b)-(c); H.R. Rep. 116-352, *supra* n. 15, at p.7 ("the United States identified individual Chinese telecommunications firms, including Huawei Technologies Co. … as posing significant threats to U.S. commercial and security interests").

[89]  *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987).

inappropriate,[90] the FCC has never claimed that a queue exists, or shown SI's place there, much less whether other providers in that line receive USF subsidies, unlike SI.

That last point matters, given Congress's directive to distribute funds equitably under the SCRP. While some carriers have received ongoing government support, such as through USF subsidies, SI has been cut off, creating a disparity that Congress sought to avoid. Granting relief would not upset agency priorities; it would correct an unjust and arbitrary delay.

**5.** The fifth *TRAC* factor assesses the "nature and extent of the interests prejudiced by delay."[91] SI responded to Congress and the FCC's invitations to participate in a program essential to the national security. SI relied on the FCC's public acclamation and its Staff's urging to start remediation before appropriations. SI then removed and partially replaced the offending goods, at great uncompensated expense. And as explained above, the agency's indecision deprives consumers in SI's underserved rural market of low-cost internet service.

**6.** Finally, *TRAC*'s sixth factor considers any alleged "improprieties in the administrative process." Although the Court need not find that an impropriety

---

[90]   *Mashpee*, 336 F.3d at 1100 (cleaned up).

[91]   *TRAC*, 750 F.2d at 80.

existed, "[w]here the agency has manifested bad faith..., the agency will have a hard time claiming legitimacy for its priorities."[92] Such evidence exists here.

- The FCC had a motive to retaliate against SI for disclosing SCRP's programmatic deficits.

- Temporal proximity to the protected speech and questionable comments about it exist. The CFO linked the freeze to the POST story and pondered SI's lacking "normal" business and cash flow—a clear unfamiliarity with SI's business plans and SCRP-5640 reports, and the SCRP's purpose.

- The FCC's actions *ante litem* and its current posture differ markedly. It approved of SI's suspending almost all service to rip and then replace the network. The agency's about-face here is inexplicable.

- The FCC imposed massive investigative demands employing thin legal theories and ignoring the statute and precedent.

- SI's FOIA requests filed six months ago seeking to shed light on the government's motivation and actions here have been stonewalled.

- Nor will the FCC respond to SI's asking it to end its Javert-like pursuit or lay out whatever substantiation it thinks reflects

---

[92] *In re Barr Laboratories, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) (an "especially shabby treatment of one applicant" may justify judicial intervention).

wrongdoing, other than to state on February 27th that the investigation remains "ongoing."

These events' confluence reflects bad faith.[93]

## IV.  Relief Sought

A writ of mandamus is necessary to compel the FCC to decide whether to lift the CFO's reimbursement freeze and/or justify its onerous delay.  The panel should retain jurisdiction and direct the FCC to submit monthly reports until a final agency disposition of this matter occurs.[94]

Respectfully submitted,

/s/Stephen C. Leckar
Stephen C. Leckar, D.C. Bar # 281691
Kalbian Hagerty, LLP
888-17th St., NW, Twelfth Floor
Washington, D.C. 20006
(202)223-5600
sleckar@kalbianhagerty.com

*Counsel for Petitioner*

---

[93]  The FCC has faced credible allegations of misconduct before.  In *Monroe Communications*, this Court declined mandamus but retained jurisdiction where the FCC's delay followed an unrebutted allegation of bad faith — namely, that it stalled action to avoid a required result.  840 F.2d at 946–47.  SI has presented a far stronger record.

[94]  *E.g.*, *Core Communications*, 531 F.3d at 861; *In re United Mine Workers of America International Union,* 190 F.3d 545, 555 (D.C. Cir. 1999).

## Certificate of Compliance

1. This brief complies with type-volume limits and Circuit Rule 21 because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this brief contains 7763 words.

2. This brief complies with the typeface and type style requirements Because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14pt Times New Roman style.

Dated: April 17, 2025                    /s/ Stephen C. Leckar
                                         Stephen C. Leckar

                                         *Counsel for Petitioner*

**Certificate of Filing and Service**

     I certify that on this 17th day of April 2025, I caused this Petition and Appendix to be filed electronically with the Clerk of the Court and correspondingly will cause a copy to be hand-served promptly to the Federal Communications Commission's General Counsel at the address which by Internet Notice (https://www.fcc.gov/general/electronic-and-hard-copy-filing-address) the Federal Communications Commission has directed such filings be accomplished:

     Adam Candeub, Esq., General Counsel
     Attn: Marlene H. Dortch, Secretary
     Federal Communications Commission
     Office of the Secretary
     9050 Junction Drive
     Annapolis Junction, MD 20701

And also by hand service to:

     The Honorable Pamela Bondi
     Attorney General
     United States Department of Justice
     950 Pennsylvania Avenue NW
     Washington DC 20530

          /s/ Stephen C. Leckar
          Stephen C. Leckar

          *Counsel for Petitioner*