# UNITED STATES COURT OF APPEALS
## For The
## DISTRICT OF COLUMBIA CIRCUIT

### No. 25--1112

*In re* SI WIRELESS, LLC

v.

## FEDERAL COMMUNICATIONS COMMISSION

**Petitioner's Reply to Opposition to Petition for Mandamus to Compel Agency Action Unlawfully Withheld or Unreasonably Delayed**

**Supplemental Appendix**

Stephen C. Leckar, D.C. Bar # 281691
Kalbian Hagerty, LLP
888-17th St., NW, Twelfth Floor
Washington, D.C. 20006
(202)223-5600
sleckar@kalbian-hagerty.com

## Table of Contents

FCC CFO Freeze Renewal (July 13, 2025) ..................................... SuppAppx-001
FCC Directive 1038-2 ........................................................... SuppAppx-006
Declarations .................................................................... SuppAppx-012
     ▮▮ Declaration (Rural Connect) ............................... SuppAppx-012
     ▮ Declaration ▮▮▮▮▮▮ ........... SuppAppx-013
     ▮ Declaration ▮▮▮▮▮ ......... SuppAppx-015
     ▮ Declaration ▮▮▮ ............... SuppAppx-017
     ▮ Declaration ▮▮▮▮ ...... SuppAppx-019
     ▮ Declaration ▮▮▮ ......................... SuppAppx-020
Letter from Stephen Leckar-Dan Daly, Esq. (July 21, 2025) ........... SuppAppx-021
Email from Dan Daly, Esq.-Stephen Leckar (July 29, 2025) ........... SuppAppx-023
Extracts from SI Sept. 17, 2024, Response to CFO
     -Ans. Req. 21 (2021 ▮▮▮▮ ) ...................................... SuppAppx-025
     -Ans. Req. 22 (Post-2021 ▮▮▮▮ ) ............................... SuppAppx-033
     -Ans. Req. 23 (SI-Rural Connect Relationship)................. SuppAppx-040
SI Response to CFO Freeze Renewal (July 13, 2025)...................... SuppAppx-042



July 11, 2025

***VIA E-MAIL ATTACHMENT***
Leslie Williams
SI Wireless, LLC
P.O. Box 8826
Columbia, SC 29202
leslie.williams@siwirelessllc.com

Steve Leckar
Kalbian Hagerty LLP
888 17th Street NW, Suite 1200
Washington, DC 20006
sleckar@kalbianhagerty.com

Re:  **Notice of Funding Hold:  Secure & Trusted Communications Networks Reimbursement Program**          SCRP Number: SCRP0001013          FRN: 0019623834

Mr. Williams:

By this letter, we are informing you that the Federal Communications Commission (FCC or Commission) will at this time continue the funding hold placed on SI Wireless LLC (SI Wireless) on July 11, 2024 that applies to all disbursements from the Secure and Trusted Communications Networks Reimbursement Program (SCRP or Reimbursement Program), as administered by the Commission, the Wireline Competition Bureau (Bureau), and the Fund Administrator.[1]  Based on the totality of the circumstances, including our review of SI Wireless's Sept. 17, 2024 response to the Funding Hold Letter and additional credible information obtained since the letter, we have determined that withholding disbursements continues to be warranted due to serious questions about SI Wireless's eligibility to participate in the Reimbursement Program as a provider of advanced communications services, and accordingly whether disbursing funds would violate the statute and rules governing the Reimbursement Program.

The Reimbursement Program was established to provide reimbursement to providers of advanced communications service with fewer than 10 million customers for reasonable costs incurred in removing, replacing, and disposing of Huawei and ZTE communications equipment and services.  In making these reimbursements, however, Congress directed the Commission to take "all necessary steps" to avoid waste, fraud, and abuse in order to ensure that the Reimbursement Program funds are used only for authorized purposes and in accord with

---

[1] Letter from Jae Seong, Chief Financial Officer, Federal Communications Commission, to Leslie Williams, President, SI Wireless, LLC (July 11, 2024) (Funding Hold Letter).

Program requirements.[2] The Commission takes this ongoing obligation seriously and recognizes the importance of protecting the integrity of the Reimbursement Program, particularly in light of the limited funds available. This includes ensuring that only entities that are eligible to participate in the Reimbursement Program receive reimbursements.

In May 2024, we became aware that the president of SI Wireless, Leslie Williams, reportedly stated that the SI Wireless network had been shut down since 2022, which raised questions of whether SI Wireless provides advanced communications service and whether SI Wireless made misrepresentations to the Commission regarding its eligibility during its participation in the Reimbursement Program.[3] On May 10, 2024, the Bureau sent the company Requests For Information (RFI) regarding the operation of SI Wireless's network and its provision of advanced communications service to customers. On May 24, 2024, SI Wireless submitted its RFI responses (Responses) to the Bureau.

SI Wireless's responses to those RFIs failed to demonstrate that SI Wireless currently provides advanced communications service to customers, as required by section 1.50004(a) of the Reimbursement Program's rules. The Responses indicated that: (1) SI Wireless "does not have normal business operations or cash flow"; (2) SI Wireless's revenue from providing advanced communications services to customers "is minimal as [SI Wireless] has not launched commercially yet," and that it does "not have normal operations or cash flows during this process and this cannot be expected until [SI Wireless] complete[s] launching what [it] deem[s] a commercially launchable interim footprint that is ready to meet customer expectations for the entire area"; and (3) SI Wireless's reference to direct customers indicates that the customers only "perform work on this project," which raises the question of whether they are in fact customers at all.[4]

Because these responses did not alleviate the Commission's concerns, it issued the Funding Hold Letter to SI Wireless. In response, SI Wireless asserted generally that it had five customers at the time of the application to the Reimbursement Program[5] and there was no requirement that these customers pay SI Wireless for the provision of advanced communications services.[6]

SI Wireless represented that at the time of its application to the Reimbursement Program it "had executed written agreements with two individuals and three firms to provide them" with advanced communications service.[7] ████████████████████████████████████████

---

[2] 47 U.S.C. § 1603(e)(1) ("The Commission shall take all necessary steps to avoid waste, fraud, and abuse with respect to the Program."); 47 CFR § 1.50004(p) ("The Commission delegates authority to the Wireline Competition Bureau, to adopt the necessary policies and procedures relating to allocations, draw downs, payments, obligations, and expenditures of money from the Reimbursement Program to protect against waste, fraud and abuse . . . .").

[3] Eva Dou, *Funding shortfall for new tech endangers rural cell service, FCC says*, Wash. Post, May 2, 2024, https://www.washingtonpost.com/technology/2024/05/02/huawei-rip-remove-order-threatens-service/

[4] SI Wireless May 24, 2024 RFI Response at 4. *But see* SI Wireless's FCC Form 5640 (answering "Yes" to the question asking "Is the applicant a Commercial Broadband Provider?") (May 25, 2022).

[5] Letter from Steven Leckar to John A. Corbin, Esq. and Dan Daly, Esq., at 1-2, 13-14, 16-18 (Sept. 17, 2024) (SI Wireless Response to Funding Hold/LOI).

[6] *Id*. at 14.

[7] *Id*. at 13-14, 17.

███████████████████████████████████████████████████████████

SI Wireless's claim that even if it had no paying customers, it is plausible for the Commission to assume that "zero is a number" and that SI Wireless is still an advanced communications provider even if it has no customers is not persuasive.[10] The Secure and Trusted Communications Networks Act of 2019 (Secure Networks Act) directs the Commission to make reimbursements to "providers of advanced communications service to replace covered equipment or services,"[11] which contemplates an active provider serving customers.[12]

In order to meet the criteria under the Secure Networks Act to participate in the Reimbursement Program, SI Wireless must be a provider of advanced communications service[13] to United States customers.[14] The certification language contained in each SCRP recipient's request for a funding allocation to participate in the Reimbursement Program makes clear that this is an ongoing requirement and includes an attestation to this effect. In connection with each of SI Wireless's requests for funding allocation, an SI Wireless officer certified[15] under penalty of perjury, and in relevant part, that:

> The Applicant is in compliance with the statute, rules, and orders governing the Reimbursement Program, including but not limited to allocations, draw downs, payments, obligations and expenditures of money, and the Certifying Official acknowledges that failure to be in compliance and remain in compliance with those statutes, rules, and

---

[8] Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs, WC Docket No. 18-89, Report and Order, 35 FCC Rcd 14284, 14333 (2020) (*Second Report and Order*) ("A provider seeking to participate in the Reimbursement Program must have [ten] million or fewer customers, as of the date its application is filed.").

[9] See *Second Report and Order*, 35 FCC Rcd at 14333, para. 114 ("We interpret 'customers of such provider' . . . to mean customers taking advanced communications service from the provider . . . .").

[10] SI Wireless Response to Funding Hold/LOI at 13.

[11] 47 U.S.C. § 1603(a).

[12] See *Second Report and Order*, 35 FCC Rcd at 14333, para. 114; Protecting Against National Security Threats to Communications Supply Chain Through FCC Programs, WC Docket No. 18-89, Third Report and Order, 36 FCC Rcd 11958, 11989-11991, paras. 75-84 (2021) (defining provider of advanced communications services with customers).

[13] See 47 CFR 1.50004(a) (The term "advanced communications service" means high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology with connection speeds of at least 200 kbps in either direction.)

[14] See 47 U.S.C. § 1603(a); 47 CFR § 1.50004(a). The Secure and Trusted Communications Networks Act of 2019 limited eligibility in the Reimbursement Program to "providers of advanced communications service." 47 U.S.C. § 1603(a). In the *Second Report and Order*, the Commission clarified that "[e]ligibility to participate in the Reimbursement Program is limited to 'providers of advanced communication service.'" *Second Report and Order*, 35 FCC Rcd at 14332, para. 110; *id*. at 14284, paras. 114-15 ("To identify customers of advanced communications service, providers must count those customers purchasing a service that includes a broadband connection with a speed of at least 200 kbps in one direction").

[15] President Leslie Williams signed this certification when he submitted SI Wireless's final application to the Reimbursement Program on January 20, 2022.

orders may result in the denial of funding, cancellation of funding commitments, and/or recoupment of past disbursements. The Certifying Official acknowledges that failure to comply with the statute, rules, and orders governing the Reimbursement Program could result in civil or criminal prosecution by law enforcement authorities.[16]

The Commission is statutorily required to limit eligibility in the Reimbursement Program to providers of advanced communications service.[17] SI Wireless's responses to the RFI questions, the Funding Hold Letter, and the information supplied by those purported to have been customers of SI Wireless at the time of its application provide a basis to reasonably believe, based on the totality of the circumstances, that all or part of further Reimbursement Program payments to SI Wireless would violate the statute and rules governing the program.

In its response to the Funding Hold Letter, SI Wireless also argues that the FCC imposed no requirement that a participant in the Reimbursement Program maintain normal business operations or cash flow during the course of its participation in the Reimbursement Program.[18] However, each submission from SI Wireless to the Reimbursement Program includes a certification that it has complied with all Reimbursement Program rules, including the requirement that participants be providers of advanced communications services. The FCC had knowledge that SI Wireless had begun the process of shutting down certain portions of its network when SI Wireless applied to the Reimbursement Program but had no reason to believe SI Wireless would cease operations completely.

After the investigation made to date, it remains unclear whether SI Wireless has ongoing network operations or whether it has been a provider of advanced communications service at any point during its participation in the Reimbursement Program. The Commission cannot deviate from the Secure Networks Act's requirement that an applicant must be a provider of advanced communications service to customers in order to be eligible for the Reimbursement Program. Moreover, the Commission cannot authorize payments to be made in violation of Reimbursement Program rules. As a result, we will continue to investigate and review the following:

1) Whether SI Wireless is in fact a provider of advanced communications service to customers and therefore eligible to participate in the SCRP (and/or was such a provider at the time of its application); and
2) Whether SI Wireless has made misrepresentations or otherwise lacked candor in its dealings with the Commission with respect to its eligibility and otherwise over the course of its participation in the SCRP.

The Commission will continue to hold any and all payments to SI Wireless until it can assess the available facts and further consider what appropriate action should be taken consistent with the Commission's obligation to protect its programs from waste, fraud, and abuse. Please be advised that in addition to this hold, the Commission may seek to recover other amounts that

---

[16] Wireline Competition Bureau Announces Best Practices for Equipment Disposal and Revises FCC Form 5640 Certifications for the Secure and Trusted Communications Networks Reimbursement Program, WC Docket No. 18-89, Public Notice, 36 FCC Rcd 14061, 14083, Appx. B: Revised Certifications for FCC Form 5640: SCRP Application Request for Funding Allocation, Section 1.50004(c) (Part C) (Certification 2).

[17] 47 U.S.C. § 1603(a); 47 CFR § 1.50004(a); *Second Report and Order*, 35 FCC Rcd at 14332, para. 110.

[18] SI Wireless Response to Funding Hold/LOI at 7-12.

are determined to have been disbursed to SI Wireless from the Reimbursement Program in violation of statutory requirements or Commission rules.

SI Wireless is permitted to demonstrate why payments from the Reimbursement Program should not be held, in whole or in part. Among the factors we may take into account are the nature and scope of the issues, the amount of money potentially involved, the ability to repay the funds if found to be improperly paid, and the effect a hold would have on customers. SI Wireless has until 30 days from the date of the letter to respond to this notice with any information that it believes the Commission should consider. If SI Wireless does not respond to this notice, then any requested reimbursements may be permanently denied.

If you have any questions, please contact Dan Daly, who can be reached at 202-418-1832, or at Daniel.Daly@fcc.gov.

Sincerely,

*Timothy Siekierka*

Timothy Siekierka for Jae Seong
Chief Financial Officer
Federal Communications Commission

cc:     Joseph Calascione, Chief, Wireline Competition Bureau, FCC
        ███████████████████████████████
        Mark Stephens, Managing Director, FCC
        Adam Candeub, General Counsel, FCC

5

| | Title |
|---|---|
| FEDERAL COMMUNICATIONS COMMISSION<br>Washington, D.C. 20554 | Standards and Process for Holding Disbursements to Beneficiaries and Service Providers. |

| | Directive Number: | Effective Date: |
|---|---|---|
| **FCC DIRECTIVE** | FCCINST 1038.2 | September 2024 |

1) <u>PURPOSE:</u>  This directive sets forth the Federal Communications Commission's (Commission or FCC) policies, procedures, and responsibilities regarding when and how the Commission may direct the holding of payments to beneficiaries and service providers under the Commission's Federal Financial Assistance Programs, which include, but are not limited to, the Universal Service Fund (USF),  Telecommunications Relay Service Fund (TRS), Affordable Connectivity Program, Emergency Connectivity Fund, and Supply Chain Reimbursement Program. *See* 31 USC 7501(a)(5); 2 CFR 200.1.

2) <u>SCOPE:</u>  This directive applies to all Bureaus and Offices within the FCC.  Pursuant to direction from and oversight by the Office of Managing Director (OMD) (in coordination with the Office of General Counsel (OGC), the Wireline Competition Bureau (WCB), the Enforcement Bureau (EB), the Consumer and Governmental Affairs Bureau (CGB)), the Universal Service Administrative Company (USAC), and Rolka Loube Associates (RLA) (collectively Administrator(s)) shall adopt written policies and procedures for funding holds consistent with this directive.[1]  In the event that a different process for funding holds has been established by rule or FCC order to govern particular categories of cases, this directive is superseded to that limited extent.

3) <u>DEFINITIONS:</u>

   a) "Credible information" means information from any source including but not limited to:
      i) Information received during the course of the Commission's own investigation or audit; an investigation or audit performed by another governmental entity; an investigation or audit by the Administrator; or an audit conducted by the funding recipient;
      ii) The filing of local, state or federal criminal charges, civil fraud charges, or qui tam suits; and/or
      iii) Information received from the media, State governmental agencies, Congress, local, state or federal law enforcement.

   b) "Federal Do Not Pay List" was created by Executive memorandum and requires agencies, before payment and award, to check the following existing databases (where applicable and

---

[1] The Administrators' policies are subject to review and approval by OMD, in coordination with WCB for USAC funding hold procedures and CGB for RLA funding hold procedures and in consultation with OGC.  In addition, the Administrators shall provide a report to OMD, WCB and CGB, with a copy to OGC, on a monthly basis detailing all funding holds.  The Administrators shall each meet monthly with OMD, WCB, CGB and OGC to review the funding hold reports.  When and if appropriate, OMD may change meetings to a quarterly cycle.

permitted by law) to verify eligibility: the Social Security Administration's Death Master File, the General Services Administration's Excluded Parties List System, the Department of the Treasury's Debt Check Database, the Department of Housing and Urban Development's Credit Alert System or Credit Alert Interactive Voice Response System, and the Department of Health and Human Services' Office of Inspector General's list of Excluded Individuals/Entities. This network of databases, and additional databases so designated by the Director of the Office of Management and Budget (0MB) in consultation with agencies, is collectively known as the "Do Not Pay List." *See* 75 FR 35953. The Payment and Integrity Information Act of 2019 and subsequent memoranda and circulars require agencies to use the Treasury Working Systems to review payments in order to verify eligibility to reduce improper payments.

c)  "Good Cause" not to hold payments or to hold payments only in part may include, but is not limited to, interference with law enforcement investigations; considerations involving life, property, or national security emergencies; or a detrimental effect on continuity of service to a substantial number of customers or end users.

d)  "Red Light" refers to a rule that requires the Commission to withhold action on applications and other requests for benefits when the entity applying for or seeking benefits has any delinquent debts owed to the Commission. *See* 47 C.F.R. § 1.1910. The red light list is a list maintained by the Commission of such entities. *See* Commission Registration System Login, Federal Communications Commission, available at https://apps.fcc.gov/cores/userLogin.do.http://.

e)  "Payment" and "funding" are used interchangeably in this directive to refer to the disbursement of funds to participants of the Programs.

f)  "Program" or "Programs" means any FCC program that is a Federal Financial Assistance Program as defined in 31 USC 7501(a)(5); 2 CFR 200.1.

g)  Administrator" means Rolka Loube Associates (RLA), the Universal Service Administrative Company (USAC), or any subsequent Administrator appointed by the Commission.

h)  "Hold" means the withholding of Program funds otherwise payable to an entity after the application of the standard found herein.


4)  <u>STANDARD:</u>

a)  The Commission may direct the Administrators to hold payment, either wholly or in part, when any of the Offices or Bureaus of the Commission has proof, or credible information, that leads the Commission to reasonably believe, based on the totality of the information available, that all or part of a payment would be in violation of the statutes and regulations applicable to the Programs. In deciding whether to hold payment(s), the Commission will consider the factors set forth at section 5 below, including whether there is good cause not to do so, or to hold funding only in part.

b)  The Commission must direct the Administrator to hold payments when an entity is

2

delinquent in non-tax debts owed to the Commission i.e., the entity is on the Commission's Red Light list.

c) The Commission may direct the Administrators to hold payments when an entity is on the Federal Do Not Pay List. *See* Do Not Pay, Department of Treasury, Bureau of the Fiscal Service, available at http://www.donotpay.treas.gov/.

5) ADDITIONAL CONSIDERATIONS AFTER STANDARD IS MET:

a) After determining that the standard articulated in section 4(a) is met, the Commission staff will consider, among other things, the following factors in determining whether to hold funding and in establishing the parameters of the hold of funding:

i) the weight of the evidence that significant program violations, or program waste, fraud, or abuse, is occurring and has resulted, or will result, in overpayments to the particular recipient;

ii) whether the issue appears to be widespread (that is, industry-wide), or isolated to a particular recipient;

iii) whether the issue is a systemic part of a recipient's operations or limited in scope to a particular geographic area or business unit;

iv) whether a full or only partial hold of funding is warranted;

v) the amount of money at stake;

vi) the impact of a funding hold on the recipient; and

vii) the precedential impact of holding funding.

6) COMMISSION PROCESS:

a) Commission staff shall coordinate on whether a funding hold is warranted as follows:

i) USF coordination shall include the Managing Director, the WCB Chief, and the EB Chief; and

ii) TRS coordination shall include the Managing Director, the CGB Chief, and the EB Chief; and

iii) Other Federal Financial Assistance Programs coordination shall include the Managing Director, the WCB Chief, and the EB Chief.

b) The WCB Chief, the CGB Chief, and the EB Chief, as appropriate, shall decide whether the known facts meet the standard articulated in section 4(a). The WCB Chief, the CGB Chief, and the EB Chief will have authority to hold funding of Program disbursements (subject to consultation with the General Counsel as described below at section 6(c)). If there is disagreement between the Bureau Chiefs on whether to hold funding, they will raise the issue with the General Counsel for final resolution.

c) The Bureaus recommending the decision to hold funding shall provide to OGC a draft letter as described in section 7(b) below. OGC staff will review, including for potential litigation risk and compliance with fiscal law. If the General Counsel believes, after review of the letter, that a hold of funding may not be justified, then the Chiefs of EB and WCB/CGB and the General Counsel will consult to determine an appropriate outcome.

d) In the event that a decision is made to hold funding, the CGB or WCB Chief(s) that initiated the hold request will send the letter to the Chief Financial Officer (CFO), or his

3

designee, who will (1) provide written direction to the Administrator to hold funding to the funding recipient; (2) issue a letter or direct the Administrator to issue a letter to the funding recipient to provide notice that the next (and subsequent disbursement or some portion thereof,) will be withheld. The Administrator will be instructed to accept such instructions only from the CFO, no other FCC staff is authorized to relay a decision directing the Administrator to hold funding for these Programs pursuant to this Directive.

e) Before any hold is implemented, OGC and/or EB will coordinate with the Inspector General and/or the Department of Justice as necessary.

7) NOTICE:

a) <u>Timing of Notice</u>:

   i) The Commission or the Administrator, at the direction of the Commission, shall provide notice and an opportunity for the entity subject to the hold to respond prior to implementing the funding hold, except in extraordinary cases where advance notice would likely cause significant harm to the Programs, for instance, by hindering the possibility of recovering funds. The Commission or the Administrator will generally provide the recipient thirty (30) days to respond.

   ii) If the Chief(s) of the Bureau(s) that initiated the hold request believes that a hold without prior notice is appropriate under (i) above, he/she will consult with the General Counsel so that they may determine an appropriate outcome. If they reach a decision that a hold without prior notice is warranted, then the Commission or Administrator may hold funding prior to such notice. In such cases, the Commission or the Administrator shall provide notice simultaneously with or as soon as possible after the decision to hold funding has been communicated to the Administrator, but no later than 15 days after the funding was expected to have been disbursed.

b) Contents of Notice. The Notice shall:

   i) State that the next (and if appropriate, subsequent) disbursement, or some portion thereof, will be withheld;

   ii) Explain that the Commission has become aware of credible information suggesting that payments would be in violation of Commission rules or otherwise improper, and has determined, based on the totality of the information available, that payment would likely not be consistent with program rules, and that a funding hold will be implemented pending completion of further investigation;

   iii) Provide the basis for the determinations in section 7(b)(ii) at a level of specificity that gives the recipient an opportunity to provide evidence or argument to the contrary, without compromising any pending law enforcement investigations, and that will allow OGC to defend the decision in court if necessary;

   iv) Give the recipient an opportunity to attempt to demonstrate why the payments should not be held. If possible, the letter should explain the type of response that could, if submitted quickly enough, resolve the issue and avoid the need for holding of payments;

   v) Without compromising any pending law enforcement investigations, describe the factual basis for the hold at a level of specificity that provides the recipient an opportunity to respond to the allegations;

   · vi) Provide thirty (30) days for the funding recipient to respond to the notice and demonstrate

4

why the payment should not be held.  The beneficiary or service provider response shall be sufficiently detailed to provide the Commission and Administrator with the information necessary to evaluate whether there has been a violation of the Program's rules;

vii) Explain that the Commission may direct the Administrator to recover from the beneficiary or service provider past funding that is found to have been disbursed in violation of the Program's rules; and

viii) Explain that if the beneficiary or service provider does not respond to the Commission's letter and requested information therein, the requested funding may be denied permanently.

c)  If the funding recipient does not persuade the Commission that the hold should be lifted, then the Commission or Administrator will notify the beneficiary or service provider of its decision as soon as practical, but not to exceed one (1) month from the date of the decision to continue to hold funding.

d)  If the funding recipient does persuade the Commission that the hold should be lifted, then the Commission will promptly direct USAC to do so using the procedures set forth below.

8)  <u>DURATION OF FUNDING HOLD:</u>

a)  Funding will be held as set forth by the process set forth above, but generally not to exceed one (1) year after the hold has been placed.  If, after one (1) year, the Commission determines that there is additional credible information to hold for longer than one (1) year, it will notify the funding recipient using the process outlined in section 7, above.  In determining whether to continue to hold funds after one (1) year, the Commission will consider the same factors set forth above for determining whether to implement an initial hold.  However, the hold will remain in place until the Commission agrees that the hold should be released pursuant to section 9, below.

9)  <u>RELEASING A FUNDING HOLD:</u>

a)  To release a funding hold, the WCB Chief, the CGB Chief, and/or the EB Chief as appropriate shall notify the CFO, or his designee, of the decision to release funding.

b)  The CFO shall:
   i)   Provide written direction to the Administrator to lift the funding hold.
   ii)  Inform the funding recipient that the funding hold has been released, or direct the Administrator to do so.

10) <u>TRACKING:</u>  The Administrators shall maintain lists of all funding withheld by the Commission or the Administrators and provide such lists, by program, to the Commission, including the Office of Managing Director, WCB, CGB, OGC, and EB on a monthly basis.  This list will include at a minimum:

a)  Name and location of beneficiary and/or provider;
b)  Month and funding year at issue (if relevant);
c)  Date that the decision to hold funding was made;
d)  Applicable FCC Form numbers associated with funding request;
e)  Reason for the funding hold;
f)  Date of notice to beneficiary and/or service provider; and

5

g)  One year deadline for the funding hold;

11) <u>EFFECTIVE DATE AND IMPLEMENTATION:</u>  This directive is effective immediately
   and shall be implemented  promptly upon distribution.

_____

Mark Stephens
Managing Director

SuppAppx-011

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED



**Steve Leckar**
sleckar@kalbianhagerty.com
(202) 223-5600 Telephone
(202) 223-6625 Facsimile

# KALBIAN HAGERTY LLP
ATTORNEYS AND COUNSELORS AT LAW

888 17th Street, NW, Suite 1200
Washington, DC 20006

July 21, 2025

**By E-Mail and First-Class Mail**
Dan Daly, Esq.
Office of the Chief Financial Officer
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

*Re: SI Wireless, LLC*
*File No. EB-FD-24-00036576*

Dear Mr. Daly:

On behalf of SI Wireless, LLC, I am responding to Mr. Siekierka's letter of July 11th extending the Federal Communications Commission's ("FCC") hold on disbursements from the Secure and Trusted Communications Networks Reimbursement Program. The Court of Appeals' briefing order issued on July 2nd, nine days before the CFO unilaterally continued a funding hold that had been in effect for a year.

Mr. Siekierka's letter demands a response thirty days later, or by Sunday, August 10th, which would roll over to Monday August 12th. As you doubtless know, SI's Reply to the FCC's Opposition to SI's petition for a writ of mandamus will be due in the Circuit Court of Appeals on August 18th. I have a scheduled one-week vacation out of town beginning immediately afterwards.

Although the Notice of Continued Funding Hold concerns some common issues with the appellate matter, it raises other discrete and fact-intensive questions. I would prefer to focus on these two matters *seriatim*, while remaining attentive to several other matters for which I am responsible in the Court of Appeals and other courts.

In these circumstances, I ask that you grant SI an extension of time to respond to the CFO's letter, to and including September 5th. This brief continuance, which continues the status quo, will not prejudice the FCC in any way.

Separately, the Siekierka letter demands that SI inform the CFO of "the nature and scope of the issues, the amount of money potentially involved, the ability to repay the funds if found to be improperly paid, and the effect a hold would have on customers." However, the letter nowhere cites or refer us to where the FCC's rules and/or internal guidelines set forth these

www.kalbianhagerty.com

Dan A. Daly, Esq.
July 21, 2024
Page 2



criteria are referenced. Could you identify the sources, so that we may evaluate the FCC's guidelines and precedent as we prepare SI's response?

Should you have any questions, please contact me.

Sincerely,

Stephen C. Leckar

cc: Leslie Williams
    Mark Stephens, Managing Director, FCC
    Joseph Calascione, Chief, Wireline Competition Bureau, FCC

    Adam Candeub, Esq., General Counsel, FCC

## Steve Leckar

| | |
|---|---|
| **From:** | Daniel Daly <Daniel.Daly@fcc.gov> |
| **Sent:** | Tuesday, July 29, 2025 11:49 AM |
| **To:** | Steve Leckar |
| **Cc:** | Adam Candeub; Joseph Calascione; Mark Stephens; Patrick Webre |
| **Subject:** | RE: [EXTERNAL]: RE: Notice of Continued Funding Hold: Secure & Trusted Communications Networks Reimbursement Program |

Mr. Leckar,

Per your request, OMD agrees to grant SI Wireless, LLC an extension to respond until September 11, 2025. Regarding your question about why the letter asks SI Wireless to inform the Commission of the nature of the issues, amount of money involved, etc., the factors are part of what the Commission may consider in deciding whether to with withhold payments, per Section 5 of the Funding Hold Directive , https://www.fcc.gov/sites/default/files/fcc-directive-1038-2.pdf.

Dan Daly
Deputy Managing Director
Office of the Managing Director
Federal Communications Commission
202-418-1832



From: Steve Leckar <sleckar@kalbianhagerty.com>
Sent: Monday, July 21, 2025 1:35 PM
To: Daniel Daly <Daniel.Daly@fcc.gov>
Cc: Adam Candeub <Adam.Candeub@fcc.gov>; Joseph Calascione <Joseph.Calascione@fcc.gov>; Mark Stephens <Mark.Stephens@fcc.gov>; Patrick Webre <Patrick.Webre@fcc.gov>
Subject: [EXTERNAL]: RE: Notice of Continued Funding Hold: Secure & Trusted Communications Networks Reimbursement Program

Some people who received this message don't often get email from sleckar@kalbianhagerty.com. Learn why this is important

CAUTION: This email originated from outside of the Federal Communications Commission. Do not click on links or open attachments unless you recognize the sender and trust the content to be safe. If you suspect this is a phishing attempt, please use the 'Report Message' feature in Microsoft Outlook or forward the email to the NSOC.

Stephen C. Leckar

SuppAppx-023

Kalbian Hagerty LLP
888-17th Street, N.W.
Suite 1200
Washington, D.C. 20006
Direct: 202 419 3286
Fax: 202 223 6625
Cell: 703 217 2273

---

**From:** Timothy Siekierka <Timothy.Siekierka@fcc.gov>
**Sent:** Friday, July 11, 2025 2:06 PM
**To:** leslie.williams@siwirelessllc.com; Steve Leckar <sleckar@kalbianhagerty.com>
**Cc:** Adam Candeub <Adam.Candeub@fcc.gov>; Joseph Calascione <Joseph.Calascione@fcc.gov>; Mark Stephens <Mark.Stephens@fcc.gov>; Patrick Webre <Patrick.Webre@fcc.gov>; Jodie Griffin <Jodie.Griffin@fcc.gov>; Daniel Daly <Daniel.Daly@fcc.gov>; Jae Seong <Jae.Seong@fcc.gov>; Brian Cruikshank <Brian.Cruikshank@fcc.gov>; Ty Covey <Ty.Covey@fcc.gov>
**Subject:** Notice of Continued Funding Hold: Secure & Trusted Communications Networks Reimbursement Program

To Mr. Williams,

By the attached letter, we are informing you that the Federal Communications Commission (Commission) is continuing its hold on disbursements from the Secure and Trusted Communications Networks Reimbursement Program, as administered by the Commission, the Wireline Competition Bureau, and the Fund Administrator, to your company, SI Wireless, LLC (SI Wireless).

If you have any questions, please contact Dan Daly, who can be reached at 202-418-1832, or at Daniel.Daly@fcc.gov.

Tim Siekierka (Acting)
*for Jae Seong*
Chief Financial Officer
Office of Managing Director
Federal Communications Commission

SuppAppx-024

MATERIAL UNDER SEAL DELETED

# Extract from SI Sept. 17, 2024, Response to CFO Q21

The following is a very small representative sample of ███████████ that was provided to the FCC in Response to Question 21 from The Letter of Inquiry dated July 11, 2024.  In total, over 45  pages of ████████ data were provided in response to this inquiry including 6 excel files containing over 7Mb of data ██████████████████████.

Response to Inquiry 21
**Total Number of Customers**
Prepared On: 8/15/2024

21.     For January 1, 2020 through December 31, 2021, identify the total number of customers
        the Company serviced each month, including a total monthly revenue amount.

**SI WIRELESS**

We do not have specific information about customer numbers and revenue prior to the IBN
acquisition of SI Wireless which occurred in July 2020, although in our due diligence conducted
as part of the current management's acquisition, we received a customer count as of January 1st,
2020, which reflected a count of 3602 direct customers and approximately 20,000 Twigby
customers at that time. By the time of the acquisition SIWs thousands of customers had been
wound down and or spun off into a separate subsidiary.

SIW suspended its service to those customers because it knew it was participating in this
program, Sprint terminated its strategic agreement with the company greatly reducing its income
and SI could not carry approximately $400,000 of tower lease monthly expense going forward
and through their participation in this program. SI at the time had a one time all tower ability to
terminate its tower leases and hindsight shows this to have been done wisely as this program
would not even pay for replacement on more than 2/3rds of those sites as things stand the
company began its planning for this program as far back as 2019 when it submitted estimates to
the Commission referred to in the Commissions first report and order.

Starting in June of 2021 (and continuing until the present) Cambium CBRS 4G equipment
was purchased and placed in use by Rural Connect, which is an Affiliate of SI, to serve
Rural Connect's paying customers. See our answer to RFI #11; the included Chart of
customer accounts and total revenue. At the time of Leslie Williams' assumption of control
of both Rural Connect and SIW, it was determined that this equipment would become part
of SIW's ongoing network as qualified 4G replacement equipment.

**RURAL CONNECT**

Please refer to "Generate monthly subscriber counts report from 2020-2024.xlsx" and other
reports included for these numbers on a monthly basis.

Supporting Documents:

- Monthly Tarana & Cambium CBRS Subscriber Count.xlsx

LW

SIWIRELESS 21-000001

SuppAppx-026

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

# Extract from SI Sept. 17, 2024,

# Response to CFO Q22

This Appendix contains a representative subset of the customer, revenue, and service records SI Wireless produced to the FCC in response to Interrogatory Q22 from the July 11, 2024 Letter of Inquiry. The production—over 700 pages and five spreadsheets—demonstrates that from January 2022 to present, SI Wireless and its affiliate Rural Connect have provided services to numerous paying customers across multiple licensed areas, in compliance with FCC-approved plans.

22.    Identify each and every customer the Company has serviced from January 1, 2022 to the present, including a summation of data per fiscal quarter and a breakdown of data by customer for the entire timeframe.  For each customer, the breakdown should include:

   a.    The customer name and address;

   b.    The Geographic Identifier (GEOID) for each customer address;

   c.    The services subscribed;

   d.    The services actually provided;

   e.    The date when promised service(s) began;

   f.    The date when promised service(s) ended (if applicable; if not, specify which service is continuing);

   g.    The reason service(s) ended (if applicable);

   h.    The months for which revenues were received;

   i.    The amount of revenue received per month;

   j.    The total revenue per customer received since January 2022; and

   k.    The relationship (if any) between each customer and any person or entity that has an ownership stake in SIW, its subsidiaries, its vendors, or any business partner thereof.

   l.    Any and all documentation of the funds received from each and every customer since SI Wireless has been a participant in the SCRP including but not limited to checks, credit card processing information, and bank deposits.

**Response:**  The answers contained herein are being provided to the best of our ability based on information readily available to us.  Any omission of information has been inadvertent.  When it seemed unreasonable to provide the volume of information being requested, we have provided a representative sample of the information in order to timely respond to the inquiry as a whole.  Please let us know if additional information is required.

**SI Wireless**

Please refer to the Supporting Documents included herein:

LW

SuppAppx-034

SIWIRELESS 22-000001

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

# Extract from SI Sept. 17, 2024,
# Response to CFO Q23

The following page is the narrative response to Question 23.  Additional supporting documentation was provided to the FCC along with this response.

Response to Inquiry 23
Rural Connect
Prepared On: 7/15/2024
Document assembled from Public Records from Secretary of State Filings

23.	Provide a detailed narrative description of the Company's relationship with Rural Connect. Identify if any person shares ownership in both the Company (or any parent of subsidiary thereof) and Rural Connect (or any parent or subsidiary thereof).  If so, explain the ownership interest.

As more fully explained in our counsel's accompanying letter to the ████████████████ Chief Financial Officer, which is incorporated by reference, Rural Connect is an Affiliate of SI Wireless and has been a customer of SI Wireless on and off since 2015. Currently, 84 Rural Connect customers are being serviced wholesale by SI Wireless' network, which serves Rural Connect. The data these customers provide is valuable to SI Wireless as it prepares for its commercial re-launch. Additionally, Rural Connect leases tower space to SI Wireless, which uses the space to mount its equipment.

Leslie Williams has owned 49% of SI Wireless since 2021 and 99% since 2023 and 41% of Rural Connect since 2022.  In addition, since about October 2021 he served as a Director of Rural Connect and as its Acting General Manager.

Supporting Documents:

- ULS Application - 0010100463 - Wiliams, Leslie_Transfer of Control
- Membership Interest Transfer Agreement_FE_Leslie49
- rev 1 BOD Resolution .docx
- Leslie Williams Rural Connect membership interest Purchase agreement.pdf

# SI Wireless, LLC

P.O. Box 8826
Columbia, SC 29202

August 15, 2025

**VIA EMAIL**

Jae Seong, Chief Financial Officer
Federal Communications Commission
45 L Street, N.E.
Washington, D.C. 20554

> **Re:** **SI Wireless, LLC**
> **SCRP Number SCRP0001013; FRN 0019623834**
> **Response to Notice of Funding Hold: Secure and Trusted Communications**
> **Networks Reimbursement Program**

Dear Mr. Seong:

On behalf of SI Wireless, LLC ("SI Wireless"), this letter responds to the Federal Communications Commission's ("FCC" or "Commission") July 11, 2025, letter ("July 2025 Letter") notifying the company that the Commission will continue the funding hold placed on disbursements to SI Wireless under the Secure and Trusted Communications Network Reimbursement Program ("SCRP" or "Reimbursement Program"). As detailed below, SI Wireless was – and remains – fully eligible for reimbursement under the Secure Network Act enacting the Reimbursement Program, it has demonstrated full compliance at every step with that statute, and as encouraged by the FCC, the company has acted swiftly to remove telecommunications equipment deemed dangerous and a threat to national security. Despite this, the Commission has failed to carry out its many obligations under the Secure Network Act including to reimburse SI Wireless even though on numerous occasions the FCC assured service providers like SI Wireless that they would not be penalized for moving quickly as we did to execute Congress's vision to ensure the integrity of the nation's telecommunications infrastructure.

Continued withholding of SCRP funds is unwarranted and contrary to the law as SI Wireless was found eligible and has complied with all requirements mandated by Congress in order to be reimbursed under the Reimbursement Program. The FCC's delay in disbursing funds for invoices submitted by SI Wireless has caused ongoing damage to the company and to its customers and the public it serves. This damage is existential to our company and can only be partially remedied by action within a matter of weeks to reimburse us amounts due as a start. Further delay daily causes the equipment we have purchased to become more obsolete, continues to allow other providers at greater price points to become more entrenched, and erodes our ability financially to compete or even to continue in business. When this freeze is promptly lifted, we will need your agency to provide additional time, flexibility and consideration for SI Wireless to replace its network due to the undue delay and cessation in processing our company's invoices for reimbursement. The boat we built to carry us to project completion has foundered, and righting it so we can get underway again will be every bit as difficult as the metaphor suggests. Among other reasons for prompt action is the lasting harm caused to a

population of citizens with limited means and the necessity to maintain the public's faith that they can rely on the government's representations and assurances that they will be reimbursed for taking actions asked of them to protect national security.

## **Background – SI Wireless's Network and Provision of Advanced Communications Service**

As an initial matter, it is important to note that SI Wireless is not a "phantom" network provider seeking to take advantage of any government programs at taxpayer expense. Rather, SI Wireless is a company in the business of providing advanced wireless communication services, mobile telephony, and wireless internet service to primarily rural customers that generally lack service from the national carriers. SI Wireless constructed from its own private funds a network that was comprised of 204 sites, and it had a customer base of approximately 30,000 customers in 2017[1] SI Wireless provided service most often on an unlimited basis and at fixed monthly rates of approximately $33 per month which has been reduced to below $30 at present.

SI Wireless has served customers on a network that it purchased, constructed, and operated and the company provided customer service through customer care centers and stores that it leased or purchased and constructed. The company also provided and will continue to provide ongoing operational jobs to people in the rural communities it serves as well. SI Wireless offers customers in rural areas better coverage than other carriers, a nationwide plan, and at better prices than the national carriers. The company, prior to this program, enhanced the service of a national carrier through an affiliation arrangement (Sprint) by sharing its network with their customers. Without SI Wireless, Sprint's customers would not have had coverage in much of SI Wireless's rural service area and this remains the case presently for customers of the T mobile network that has absorbed Sprint. The revenue for SI Wireless's operations had come both from Sprint for network access, and direct payments from SI Wireless's own customers. SI Wireless did not and does not receive any USF support. Customers pay for SI Wireless's service because the company offers essential wireless services at affordable price points in rural areas that are otherwise unserved.

In late 2018 it was reported that T-Mobile and Sprint's parent companies had agreed to merge and were seeking approval from various departments of the U.S. government.[2] It was also reported that these national carriers had agreed to remove Huawei equipment (used by SI Wireless) from all their worldwide networks in order to gain approval for this merger.[3] Although no government entity thought to help ensure companies such as ours would not be adversely affected our company would have been fine absent the Huawei condition T-Mobile also had an acute lack of network facilities in SI Wireless's service area and could have benefited substantially from continuing the network-sharing arrangement. Instead, per the agreement, this

---

[1] https://www.lightreading.com/mobile-core/rural-carrier-mobilenation-apparently-shutting-down-in-january (last visited Aug. 13, 2025)

[2] https://www.reuters.com/article/world/exclusive-t-mobile-sprint-see-huawei-shun-clinching-us-deal-sources-idUSKBN1OD2IA/#:~:text=WASHINGTON%2FNEW%20YORK%20(Reuters),shut%20out%20the%20Chinese%20company. (last viewed Aug. 13, 2025).

[3] *Id.*

Jae Seong, Chief Financial Officer
August 15, 2025
Page 3

was scuttled, and Sprint cancelled the agreement premerger as promised and T-Mobile/Sprint customers could not use SI Wireless's Huawei-based network. As a result, our customers lost their national service areas and were left with unmarketable and unacceptable service as a result. As a company focused on providing the best service at a reduced price, we were left with only one viable decision and that was to facilitate moving ours customers to another network then quickly replacing our Huawei equipment to provide an acceptable service experience while also serving roaming or network sharing customers from T mobile or another emerging national carrier in the same way we had previously. This is the plan SI Wireless submitted for your agency's review, received formal approval for, and executed to the extent possible under the circumstances we have encountered.



---

[1] 2nd Report and Order § 56 at 28

[2] FCC Notice of Funding Hold – July 11, 2024 at 3

[3] https://www.fcc.gov/news-events/events/2021/09/secure-and-trusted-communications-networks-reimbursement-program-webinar (last visited Aug. 13, 2025).

[4] FCC Notice of Funding Hold Renewal Letter – July 11, 2025 at 2-3

[5] See Exhibit A – Sworn Customer Declarations

4 Id., Declarations ██████████████████████████ These declarations directly contradict the Commission's contention that no customers took service from SI Wireless at the time of its application to the Reimbursement Program. See July 2025 Letter at

It is also important to understand that, unlike other carriers, SI Wireless does not receive any universal service fund ("USF") support for operating in rural areas. There might be a misunderstanding regarding this as shown in your agency's question 19 in the Letter of Inquiry date July 11, 2024 [5] wherein the FCC asked us to provide to the FCC information regarding the amount of these funds that we do not receive from once again the FCC. This leads us to wonder if your agency might be thinking that we actually were getting these funds and therefore were being unduly impatient and ungrateful as the assumption was that we were in fact being well compensated throughout this project with USF operating funds as many of the other carriers were. To be clear, ***no such support is available*** to help this company weather the replacement project period and we are in fact from the inception being put out of business because of the FCCs delays in this project. Indeed, once it became clear that Replacement Program funds would only be sufficient to cover approximately 39% of reimbursement requests, other rural carriers, primarily those receiving USF support, elected not to "rip and replace" covered requirement like SI Wireless did. Rather, those carriers embarked on the opposite strategy, i.e., "replace then rip", to ensure that they could continue to receive USF support to fund their operations until such time as they could be assured that full SCRP payments would be available to fully capitalize their covered equipment replacement projects. This may also be why your agency believes it is possible to have ongoing normal customers when one is ripping and replacing their network. It is not. Only if replacing then ripping can normal customers be retained and that is not how your agency refers to the program[6] nor is it consistent with your agency's call to remove networks before the inception of the program[7] even if it means starting over from scratch[8]. Those carriers like us who answered your agency's call when made to remove Huawei equipment[9] had no secure network to serve normal customers at the time applications were submitted. Yet it is SI Wireless who responded and is now affected most by the delay in making reimbursements in general and is the only participant subjected to this freeze. Your agency is required by statute to give weight to the needs of participants in equitably disbursing funds [10] and that statutory obligation at this point demands that this freeze be ended and that funds be immediately distributed to us to restore our network, which was dismantled as

---

2-3. See Exhibit A, Decl. ████████████████████ These contradict the statement that no customers informed your agency of having taken service.

[5] FCC Letter of Inquiry, dated July 11, 2024 at 5

[6] As early as 2022, the FCC refers to the SCRP Program as "Rip and Replace" in their Commission Documents section of their website - See https://www.fcc.gov/document/rosenworcel-notifies-congress-demand-rip-and-replace-program (last visited Aug. 13, 2025).

[7] 2nd Report and Order at 58 *"We will not penalize these providers for taking decisive, proactive steps to secure their networks before the reimbursement program is created and funded."*

[8] *See* n.6, *supra.*

[9] 1st Report and Order at 46

[10] *See* Section I.B. & n.7, *infra.*

a requirement of this Program – this is the only way our small company will survive. Our need is assuredly the greatest at this point of any participant.

SI Wireless embarked on its network replacement program spurred on by the FCC's call to take immediate action "now" to remove covered equipment from their networks.[16] In the name of national security, the Commission represented to and assured carriers that they would be reimbursed and not be penalized for following Congress and the FCC's directives.[17] It was acknowledged that for some this would involve starting over from scratch[18] and our company, through its lawyers, actually confirmed with your agency at the time and was told that we were "good to go", but to maintain thorough records *not of customers* but of disposal of equipment.[19] Those representations and assurances have not been fulfilled for SI Wireless. The entire time we have been in this program we have been starved for the reimbursements needed to get the job done in a progressive way leading to what now seems to be our impending business failure. As of this writing, we have invoices that are up to 769 days old that are still in Submitted status. Of that time, the freeze has been in place for only 397 days; therefore, for the preceding 372 days, your agency had not even reviewed or looked at these. In your recent Spending Report, the agency claims that initiating reimbursement for invoices from January to March 2024 took an average of 11.34 days[20]. For SI Wireless, however, invoices submitted during that period took an average of 129.03 days to have the reimbursement claim initiated—and this was all before the funding freeze. The bulk of the 13% of funds reimbursed to date have been for network removal, only a bit over $11,000,000 or less than 7% percent of the funds to replace this network per costs approved by your agency have been reimbursed to SI wireless in a period that exceeds the statutory performance period by over 300% and counting. The Commission's extreme delays and extraordinarily onerous, burdensome, and languishing inquiry into SI Wireless's replacement plans have caused ever-increasing, irreparable damage, while our company's dire needs remain not considered in either the action taken by your agency or the time with which you fail to take action. SI Wireless is in severe financial distress and urgently requires the FCC to fulfil its obligations under the Secure Network Act to safeguard the nation's telecommunications network, and to ensure that SI Wireless has funding to replace its now removed network immediately in consideration of its immediate needs.

I.  **Discussion**

A.  **The Secure Network Act Requirements**

As the Commission is aware, the Secure Network Act states that the FCC "shall establish a reimbursement program" to provide funds to service providers for "permanently removing,"

---

[16] *See* Section I.B. & n.31, *infra*.

[17] *See* Section I.B. & n.30, *infra.*

[18] *See* n.6, *supra.*

[19] *See* Exhibit B – email re: FCC call on equipment destruction – Carri Bennett

[20] 6th Report and Order at 12

"replacing," and "disposing of" "covered communications equipment or services."[16]  The Secure Networks Act also states that the FCC "shall make reasonable efforts to ensure that reimbursement funds are distributed equitably among all applicants…according to the needs of the applicants…."[17]  In order to ensure that program participants are fairly treated under the Replacement Program and that funds are quickly distributed to participants, the statute imposes several duties on the Commission, including, among others, the duty to "mitigate the administrative burdens and costs associated with the application process";[18] provide an opportunity for applicants to cure application deficiencies;[19] and to conduct audits, reviews and field investigations,[20]  Furthermore, given the national security concerns caused by Huawei and ZTE equipment, Congress included a rule of construction authorizing reimbursement "before the provider incurs the cost of the permanent removal, replacement, and disposal" of the Huawei and ZTE equipment.[21]  The Secure Networks Act also established a mandatory one-year deadline for "the permanent removal, replacement, and disposal of any covered communications equipment or services … after the date on which the Commission distributes reimbursement funds to the recipient."[22]

## B. The FCC's *2020 Supply Chain Order* and Assurances to Service Providers of Reimbursement.

In response to Congress's mandate to remove dangerous telecommunications equipment from the national telecommunications network to protect national security, the FCC adopted the *2020 Supply Chain Order* implementing the Reimbursement Program.[23]  The Commission actively encouraged service providers to remove dangerous equipment from their networks and assured them that they would be reimbursed for proactively removing Huawei and ZTE equipment from their networks to protect national security.  Specifically, the Commission applauded providers for proactively taking steps to increase the security of their networks even though the Reimbursement Program had not yet been established, encouraged them to take steps to remove and dispose of covered equipment, and assured them that they would not be penalized for taking decisive, proactive steps to secure their networks before the reimbursement program was created and funded.[24]  The FCC stated that it would allow providers to obtain reimbursement

---

[16] 47 U.S.C. §§ 1603(a) and (c)(1).

[17] 47 U.S.C. § 1603(d)(5)(A).

[18] 47 U.S.C. § 1603(d)(2)(C).

[19] 47 U.S.C. § 1603(d)(3)(B).

[20] 47 U.S.C. § 1603(e)(3).

[21] 47 U.S.C. § 1603(h).

[22] 47 U.S.C. § 1603(d)(6)(A) ("shall be completed not later than one year").

[23] *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Second Report and Order, 35 FCC Rcd 14284 (2020) ("*2020 Supply Chain Order*").

[24] *2020 Supply Chain Order, supra note 26, ¶ 130, at 57*

for costs reasonably incurred prior to the creation of funding of the Reimbursement Program, and SI Wireless removed and disposed of covered equipment that met the timing requirements set forth in the *2020 Supply Chain Order*, and in reliance on the FCC's representations in that order.[25]

The FCC produced a webinar on September 27, 2021, confirming that providers who acted in good faith to begin the removal and replacement process prior to the reimbursement application window would not be penalized and could still qualify for funding.[26]  FCC staff emphasized that reimbursement eligibility could include expenses incurred before the program formally launched, so long as the provider met the other statutory criteria.  During that webinar, Trent Harkrader, Chief of the Wireline Competition Bureau, stated that removing insecure equipment from existing networks after installation was challenging.  In some cases, it would mean starting over from scratch, and emphasized that "the time is now to remove this equipment from our network."  Then-Acting Associate Chief of the FCC's Wireline Competition Bureau, Justin Faulb, stated that reimbursement would be provided for expenses incurred to remove and replace equipment even though the service provider had not actually paid for the replacement equipment because the FCC recognized that small companies lacked the resources to float such expenses while waiting to be reimbursed.  This reinforced that providers like SI Wireless, who acted promptly to secure their networks based on the Commission's urging, were intended to receive reimbursement and advance payments under the Reimbursement Program.

### C. SI Wireless has Complied with the Requirements in the Secure Networks Act and the FCC's Rules, and Must be Reimbursed.

#### 1. SI Wireless Currently Provides Advanced Communications Service to Customers.

In the July 2025 Letter[27], the FCC made several allegations questioning SI Wireless's eligibility for SCRP reimbursements, all of which are meritless.  First, the letter states that SI Wireless's responses to the Wireless Competition Bureau's ("Bureau") May 10, 2024, Requests for Information "failed to demonstrate that SI Wireless currently provides advanced communications service to customers, as required by section 1.50004(a) of the Reimbursement Program's rules.[28]  That rule, which tracks the eligibility requirements in section 1603(b) of the Secure Networks Act,[29] only requires a provider, such as SI Wireless, to have 10 million or fewer customers, and to certify that it has developed a plan and a timeline for the removal, replacement, and disposal of covered equipment.  SI Wireless met those requirements.  It has less than 10 million customers, and it has developed a plan and timeline to remove, replace, and dispose of its Huawei network.

---

[25] *2020 Supply Chain Order, supra* note 26, ¶ *108, at 48*

[26] *See* n.6, *supra*

[27] FCC Notice of Funding Hold Renewal Letter – July 11, 2025

[28] *Id.* at 2.

[29] 47 U.S.C. § 1603(b).

The network replacement project required SI Wireless to transition most of its customers to an affiliate,[30] and to notify other customers that the company would no longer be able to provide them with the services they had become accustomed to receiving[31]. Also as mentioned above, SI Wireless was nonetheless able to continue to provide advanced communications service to a few customers growing to many customers once the network removal and replacement project commenced on equipment installed for this purpose. [32]

### 2. SI Wireless Had Ongoing Operations During the Relevant Time Period, and the FCC Knew This Fact.

Second, the letter states that it was "unclear whether SI Wireless has ongoing network operations or whether it has been a provider of advanced communications service at any point during its participation in the Reimbursement Program." Nowhere in the statute is "ongoing network operations" a requirement for SCRP eligibility — a point the Commission has understood, as evidenced by the fact that it has not conducted the "random field investigations to ensure that recipients of reimbursements under the Program are performing the work such recipients are required to perform under the commitments made in the applications."[33] SI Wireless has explained its plan and progress at every opportunity in its applications, modifications, and status reports[34], and has invited the Commission to visit on multiple occasions to observe the work and better understand the company's needs, as the statute charges the Commission to do.[35] Had those duties been carried out, the record would reflect facts inconsistent with the statement in the July 2025 Letter.

---

[30] Section 1603(b)(1) states that Reimbursement Program participants are those that have 10 million or fewer customers. 47 U.S.C. § 1603(b)(1). That section does not require participants to have current, active customers. To the extent that there is such a requirement, and SI Wireless does not concede that it does, SI Wireless does in fact have active advanced communications services customers. Moreover, the advanced communications services customers of its affiliates, which customers your agency has been informed of, are also considered to be SI Wireless's customers. Section 1608(b) defines "customers" for purposes of the Secure Network Act as "(A) the customers of such provider; and (B) the customers of any affiliate…of such provider." 47 U.S.C. § 1608(b). *See also 2020 Supply Chain Order* ¶ 114 ("Given the overall intent of the program to assist with the removal of equipment and services posing a national security risk and the language in the House Report, we choose to interpret customer narrowly, which in turn will *increase the pool of eligibility for the program.* Accordingly, we interpret 'customers of such provider' and 'customers of any affiliate' to mean *those customers taking advanced communications service from the provider and its affiliates*.") (emphasis added).

[31] *See* n.1, *supra*

[32] *See* Section II.C.2, n.20, & FCC Notice of Funding Hold – July 11, 2024, *infra*.

[33] 2nd Report and Order at 76

[34] *See* Exhibit C and Exhibit D

[35] *2020 Supply Chain Order, supra note 26, ¶ 109, at 48*

SI Wireless has been licensed by the FCC as a wireless telecommunications provider since 2011. SI Wireless is a critical provider of high-quality, affordable services and equipment to what was—and is intended to again be—a sizable rural customer base. Over 191,000 people in our service area formerly relied on the FCC's Affordable Connectivity Program (cite) for a $30 monthly discount on fiber service that otherwise cost $59 to $89 per month. We now offer unlimited service at $30 per month, effectively replacing this COVID-19–era subsidy program, which has since ended. No additional subsidy is required, no billions in construction funding are necessary, and the FCC has long pursued the very outcome that SI Wireless is already delivering. We also provide the benefits of competition—lower prices and higher-quality service—which your agency frequently espouses, to those in our rural areas who are not yet our customers.

Before committing to this program, as announced by our president in November of 2019, and before moving all customers off our network in January 2020[36]. SI Wireless operated a network of 204 sites providing advanced communication services to more than 30,000 customers. After the FCC announced the SCRP program and asked providers to remove insecure network equipment, SI Wireless continues to implement their approved network replacement plan which included transitioning customers to an affiliate, notifying customers that could not be transitioned that SI Wireless would not be able to continue providing them with service, and providing ongoing advanced communications—initially to a limited number of customers and eventually to hundreds—during the network replacement period.

The statute and FCC rules do not expressly require continuous service—let alone "normal" service levels—as a condition of participation in the Reimbursement Program. The Commission strongly urged service providers to remove covered equipment[37] from their networks, which SI Wireless did. The removal of that equipment necessarily reduced the level of service and coverage the company could provide compared to its network before removing Huawei equipment. SI Wireless relied on the FCC's assurances that funding would be forthcoming to replace compromised network equipment so that service could be restored. In taking these steps, SI Wireless temporarily forewent a significant portion of its revenue, with the period of reduced service reasonably expected to last approximately two years from the date of the application for removal of covered equipment. Had the FCC fulfilled its statutory obligations with respect to the company, this dispute could have been avoided.

As discussed above, the FCC's Chief of the Wireline Competition Bureau, emphasized that "the time is now to remove this equipment from our network." It is important to note that section 1603(d)(6)(A) of the Secure Networks Act requires completion of the permanent removal, replacement, and disposal of any covered communications equipment or services within one year.[38] The FCC has disbursed to SI Wireless only $24,475,356.45 of the $181,087,825.81 approved to remove, replace, and dispose of Huawei equipment and only slightly over 11 million or less than 7% of the approximate $181 million awarded has been for actually rebuilding this network. In spite of this we have already deployed equipment on over 100 sites, or about half of the 204 sites we set out to replace—a remarkable accomplishment in the face of being paid less than 7% of the funds in total and nothing for over the last year. SI

---

[36] *Supra note 34*

[37] See 2020 Supply Chain Order, ¶ 130

[38] 47 U.S.C. § 1603(d)(6)(A) ("shall be completed not later than one year").

Wireless was a financially sound company with minimal debt when it undertook the dismantling of its Huawei network and temporarily forewent revenue. Prompt completion of the network replacement, however, was essential. This was made clear in the SCRP application plan and the modification to deal with the Program's short funding submitted to and approved by the Commission[39].

        **3.     SI Wireless Clearly Provided Advanced Communications Service to Customers Pursuant to the Act and the FCC has Cited Authority for its position which does not in any way support its position.**

       Third, the FCC incorrectly contends that "[i]n order to meet the criteria under the Secure Networks Act to participate in the Reimbursement Program, SI Wireless must be a provider of advanced communications service to United States customers."[40] The Commission reads a "currently providing" requirement into the statute and the rule that does not exist. Neither requires the ongoing provision of advanced communications service, which makes sense. It is near impossible if not completely impossible for a small, rural service provider that does not receive any USF support to both comply with the requirement to remove covered equipment from its network, while at the same time construct a brand-new network before funds have been disbursed under the Reimbursement Program. Furthermore, it is unlikely that Congress intended to exclude from the program a company that was in the process of deploying covered, high-risk equipment but had not yet acquired its customer base—a result that would flow from reading a nonexistent 'currently providing' requirement into the rule. The citations provided in the Second and Third Report and Order do not support this conclusion, nor do they offer any justification for adding provisions that do not appear in the statute. Below is the paragraph of the 2020 Supply Chain Order ¶ 114 that you cite to:

       *114. We read the phrase "customers of such provider" and "customers of any affiliate" as having more than one possible interpretation. The language could refer only to those customers purchasing advanced communications service or could refer to any customer of the provider or affiliate regardless of the service or product purchased. The accompanying House Report states "[s]ection 4 requires the FCC . . . to reimburse providers of advanced communications service with 2 million or fewer subscribers."[346] This language suggests an intention to focus on the subscribers of the provider that purchase advanced communications service in determining eligibility. The House Report also states the Reimbursement Program is established "to assist small communications providers with the costs of removing prohibited equipment and services from their networks."[347] By limiting the meaning of "customer" to those purchasing advanced communications service, potentially a large company with a small number of advanced communications service customers could qualify for the Reimbursement Program. Given the overall intent of the program to assist with the removal of equipment and services posing a national security risk and the language in the House Report, we choose to*

---

[39] *Supra note 37*

[40] July 2025 Letter at 3 & n.14 (citing and discussing 47 U.S.C. § 1603(a); 47 C.F.R. § 1.50004(a)).

*interpret customer narrowly, which in turn will increase the pool of eligibility for the program. Accordingly, we interpret "customers of such provider" and "customers of any affiliate" to mean those customers taking advanced communications service from the provider and its affiliates. A provider seeking to participate in the Reimbursement Program must have two million or fewer customers, as of the date its application is filed.[348]*

> *Footnote 348 reads "If the provider's number of customers increases above two million after its application is filed, they will not lose their eligibility to participate in the Reimbursement Program by virtue of the customer increase."*

If this is the authority you cite—and assuming that no one without your agency's interpretive expertise could make sense of it—you are relying on a discussion that:

a)  Starts by admitting that there is more than one possible interpretation of what you cite as a basis for effectively denying our company's eligibility.

b)  starts by describing <u>customers 'purchasing'</u>, then discusses that the House's intention suggests focus on <u>Subscribers purchasing</u> but concludes that the terms at issue refer to <u>customers 'taking'</u> (underlines added) and not just that taking service from the provider and its affiliates. While 'purchasing' might suggest a paying customer, taking' in no way suggests paying to be a requirement especially when contrasted to purchasing in the same sentence. There is no question SI Wireless had customers "taking" service at the time their application was filed and beyond[41].

c)  adds a timing requirement —'as of the date its application is filed'—which is nowhere in the statute. The Act states:

> (b) ELIGIBILITY.—The Commission may not make a reimbursement under the Program to a provider of advanced communications service unless the provider—
> > (1) has 10,000,000 or fewer customers; and
> > (2) makes all of the certifications required by subsection (d)(4).
> > (basically requiring a plan)

If anything, the Act required a "less than" number but certainly did not require a "more than" number at the time of making or receiving a reimbursement. For SI Wireless the first reimbursement was in late 2022[42] at a time that equipment had already been purchased and deployed. At this time paying customers were both taking service and purchasing service provided on that equipment. In addition, reading in a nonexistent "time of application filing" requirement makes even less sense when you understand the FCCs direction to rip out the networks that served customers well before the application date. To repeat you can't serve customers on a network that has been dismantled.

---

[41] *See* Exhibit A

[42] First SCRP Reimbursement was received and posted into the SI Wireless bank account on November 23, 2022

d) The cite contains references to Congressional intent but in no way here or otherwise is it explained how requiring customers at any time between "rip and replace" or more appropriately "rip and replace and make ready" serves any intent stated or that could be stated.  Please tell what important goal of national security or equity or potential fraud or waste or anything is served by having to have customers during the time the network is ripped. It is totally in opposition to the goal of replacing these networks where they were not serving customers at the time of the application but would and could be used to do so.  Congress did not say when, Congress did not say paying, and Congress did not say a more than number just a less than number.

e) The cited provision claims your agency's intention is to "increase the pool of eligibility for the program" — yet it is used here to narrow eligibility, excluding not only SI Wireless but also any other provider that did not have customers taking service at the time of application. This exclusion would apply whether a provider had already dismantled its network, was in the process of launching service, or used covered equipment for intermittent operations such as special events. All of these scenarios present the same national security risks if covered equipment is not replaced, which was the clear intent of Congress to address.

f) clearly states we interpret "customers of such provider" and "customers of any affiliate" to mean those customers taking advanced communications service from the provider and its affiliates yet you state the opposite in refusing to count the customers of the affiliates of SI Wireless that existed taking and purchasing normal service throughout this entire program and for which your agency has been provided detailed records;

g) and finally this cite declares that "If the provider's number of customers increases above two million after its application is filed, they will not lose their eligibility to participate in the Reimbursement Program by virtue of the customer increase"

    i. Despite Congress' clear instruction to your agency that it not make reimbursement to a provider that exceeds a certain number of subscribers —a fact seemingly ignored based on this addition;

    ii. Congress did not establish any minimum "floor" of subscribers for program eligibility. Nevertheless, someone within the agency—whose identity, authority, and reasoning have not been disclosed to us despite valid requests—has created a shifting, extra-statutory requirement. What began as an extra "requirement" of "more than zero" customers to mirror the statute's "fewer than" cap has evolved from requiring a single customer, to "undefined normal customers," and from being measured "at the time of application" to being required "throughout the program." None of these conditions appear anywhere in the Act, which again sets forth only two eligibility criteria: that a provider have no more than two million customers and that it make the certifications required by subsection (d)(4)[43]

---

[43] 47 U.S.C. § 1603(b)

    iii.   And  can you explain how allowing Level Three Communications—a company with over 24 billion in assets and the third largest fiber provider in the country —which did not initially qualify for the program is now permitted to participate[44] and given an allocation of all the funds that were "saved" (an amount your report does not define) by denying payments to our company and others when those funds were needed most?  How does this square with your own cited language that "[t]he House Report also states the Reimbursement Program is established 'to assist small communications providers ….'""?  Si Wireless is precisely the "small communications provider" spoke of here and none of the statutory language would permit the result of running us out of the program—and out of existence—in favor of large company corporate welfare—a result Congress specifically prohibited by the language of the statute enacting this program.

    iv.   This referenced provision clearly also shows that eligibility once obtained cannot be lost for others despite contradicting statutory language but for our company it can be lost based on nonexistent statutory language.  In this case application date seems to be of primary importance to your agency without statutory citation or referenced intent.  No explanation is provided on why the date one committed to the program and to remove its network and with it its customers as directed would not be the logical date absent clear statutory direction.  SI wireless had approximately 30,000 customers when we committed to this program[45].

**4.  The Secure Network Act Requires the Commission to Reimburse SI Wireless for Dismantling and Replacing its Huawei Network to Protect National Security, and Withholding Funding from SI Wireless Violates the Law.**

As discussed above in Section I.A, *supra*, section 1603(a) of the Secure Networks Act[46] required the Commission to establish the Reimbursement Program to replace covered equipment. SI Wireless has removed and destroyed an entire network of over 200 sites with two switching centers.  It has, among other things, replaced equipment on over 100 sites, redeployed one switch, and moved a switching center to a different location and hardened the location, installed equipment for the core of its interim offering, and installed redundant power backup systems in place.  This was all done while waiting for the Commission to reimburse the company for this work—reimbursement that was never reasonably provided and has now ceased. SI Wireless

---

[44] 6th Report and Order at 3

[45] https://docs.fcc.gov/public/attachments/fcc-19-121a1.pdf at 45 (last visited Aug 13, 2025)

[46] 47 U.S.C. § 1603(a).

cannot go any further due to the FCC's failure to comply with its duties to reimburse us equitably in accordance with our need.

Section 1603(d)(2)(C) – Mitigation of Burden – provides that "in developing the application process under this paragraph, the Commission shall take reasonable steps to mitigate the administrative burdens and costs associated with the application process, while taking into account the need to avoid waste, fraud, and abuse in the Program."[47]  The FCC's hold on disbursements to SI Wireless is unwarranted as there is no evidence of waste, fraud, or abuse by SI Wireless.  Further, contrary to the statute, the FCC's application process now appears to be essentially reopened after being concluded.[48]  More than a year had past post application for the Commission to approve a modified plan necessitated by the lack of full funding for SCRP participants.  The commission took another 4 months when presented with a modification to correctly ascribe equipment to sites resulting from that first approved modification but required SIW to break this submission into three parts so it could be approved in "a couple weeks" then proceeded to approve only one third of that required submission in a period of  4 months during which time all invoicing and payment for our company was shut down as it was during the 5 month period for the modification. This is not what was asked of your agency. The Commission also issued a large number of extremely onerous and burdensome data requests to SI Wireless, which included over 2,400 individual answers covering more than 50 sections and subparts in revisiting this application.  This also while all payments and invoicing were shut down.  The FCC has utterly failed in its duty to mitigate the burden on SI Wireless's application process.

SIW was one of the first companies to respond to the FCC's call to remove covered equipment from their networks.  This required the company to forgo cash flow even before the start of the application process.  The FCC created a short-funded situation that precluded funding for a complete network replacement, and it then became clear when SI Wireless's application was still being considered and approved that it would be necessary to modify the approved plan to deal with the fact that only 39 percent of the necessary funding for completion was available.  There was no guarantee of when or if the remainder would become available.  Those network operators that chose to continue to put the nation's security at risk and that did not remove covered equipment from their networks could just wait for full funding and possibly order equipment with allocated funds in a way not requiring any modification or shut down of their ability to invoice or be paid.  SI Wireless, however, who did as asked, was left unassisted with the situation of having to figure out how best to make some kind new sustainable business plan from a reconfigured network using only the 39% of funds available to it at that time and possible ever.  Instead of realizing the burden on our company and its unique needs to complete this quickly, your agency and its administrators responded with ever increasing hurdles to receive payments and paying us less than 7% to date of the estimated cost of network replacement over the ensuing three years of what was mandated to be a one-year replacement period.

The administrative burden the FCC has placed on SI Wireless, in contravention of the mitigation requirement in section 1603(d)(2)(C), has been extreme.  SI Wireless has been

---

[47] 47 U.S.C. § 1603(d)(2)(C).

[48] To the extent that the FCC has reopened SI Wireless's application, and it is not clear that the Commission has done so, SI Wireless must be afforded the opportunity to cure any deficiencies. 47 U.S.C. § 1603(d)(3)(B).

required to jump through every imaginable hoop in order to receive what to date is only less than 7% of replacement funds and just over 13% of overall funding for removing and replacement of its network. Insufficient to generate virtually any type of cash flow for this company at all. As a result of responding to the FCC's pressing call for carriers to remove hazardous Huawei equipment, SI Wireless is now in a situation where replacement of its network is the only means available to generate cashflow. SI Wireless is on the verge of bankruptcy, and if the Commission had acted as required under the law to promptly reimburse the company, SI Wireless would not be in its current precarious financial situation, and its customers would now have the service they had previously enjoyed for years restored.

Section 1603(d)(5)(A) requires the Commission to "make reasonable efforts to ensure that reimbursement funds are distributed equitably among all applicants for reimbursements under the Program according to the needs of the applicants".[49] There are few and likely no applicants who were originally more in "need" of reimbursement funds that SI Wireless and certainly none at this time after you have frozen all payments to us for over a year. The company removed its old network and source of revenues at the earliest date in order to comply with what was supposed to be a one year performance period.[50] SI Wireless obtained commitments from many small businesses and individuals (with dependent families) to do the work necessary to accomplish the removal of covered equipment in the amount of time then understood and in reliance upon the FCC representations that the company would be timely reimbursed for its efforts. Many of these small businesses and individuals have agreements to receive subsistence level payments through the performance period and the remainder when this company is paid. Many contractors who committed to the project have been left without the promised work— having turned down other opportunities to remain available—when the project became underfunded and delayed. Had the Commission paid SI Wireless according to its demonstrated needs, and equitably as required by the statute, the company would not now be facing extreme financial distress. Nor would its vendors, contractors, and employees be facing similar circumstances. Most importantly, customers in historically underserved rural areas would once again have access to a better and more affordable service option.

### Repayment

Because SI Wireless has complied fully with the Secure Networks Act and all FCC rules, we do not anticipate that any funds would ever be found to have been improperly paid. In addition, every single invoice submitted by SI Wireless is reviewed and approved by Ernst & Young (EY), the FCC's Fund Administrator, before payment. This process ensures that all disbursements have already been vetted and determined to be legitimate and allowable expenses under the Program. Further, under the Secure Networks Act, repayment obligations arise only if the Commission finds a violation of the Act or its rules, provides formal notice of that violation, and allows 180 days to cure. Prior to that when as here the alleged problem is with an

---

[49] 47 U.S.C. § 1603(d)(5)(A).

[50] 47 U.S.C. § 1603(d)(6)(A) ("shall be completed not later than one year"). The FCC's delays in providing funding to SI Wireless as required by statute will likely cause the Commission to violate Congress's one-year deadline.

application there is another cure period in 47 U.S.C. § 1603(d)(3)(B). No such cure period has ever commenced. All we can say on ability to repay is that your agency certainly in refusing to reimburse us for ongoing expenses is obviously eroding our ability to pay any of our bills every day.

## II. <u>Conclusion</u>

SI Wireless is a small rural provider of advanced communication services that neither had nor has the resources to dismantle its Huawei network while simultaneously providing service to customers at the same level they are accustomed to. We could not—and never planned to—construct and operate a second network prior to removal of our Huawei network and receipt of Reimbursement Program funds to replace our network. Having prepared in every way to accomplish the task of completely dismantling and replacing what had took SI Wireless over two years to build initially in a period shorter than that, SI Wireless's reconstruction plan has been hindered from the beginning by scant, delayed and haphazard payments that have spread discord among its contractors—followed by no payments at all for over a year. The Commission has failed to follow the statute and disburse funds according to need and prioritize a company like SI Wireless that would be put out of business due the funding shortfall while continuing to fund virtually all other companies in the program including those receiving ongoing operating funds from your agency at much higher levels.

As SI Wireless has previously informed the Commission, the company is in grave danger of failing economically. SI wireless has received only 13.5% in total for the project or 7% of the approved budget to replace its network under the program. SI Wireless has been forced to undertake debt financing to restore equipment to over 100 sites. Assuming that SI Wireless is able to survive —something far from certain at this stage—SI Wireless will provide critical competition and service in rural areas, driving down prices and increasing quality for all consumers. SI Wireless' network can also reach remote areas where fiber cannot, such as deep into farmland. The company has been working with technology-based agribusiness firms that have agreed to implement pilot programs to increase food production and allow for savings of resources such as water and fertilizer in these areas. SI Wireless was also selected to lead a program to build out unbuilt portions of a national carrier's footprint for full mobility that would have gained our customers access once again to the national services we were able to provide before voluntarily subjecting ourselves to the unfulfilled promises from your agency.[51] The actions of your agency killed this opportunity as well by informing the carrier that you were "litigating" with us, inflicting further damage to our company.

Perhaps an easy reason to stop this freeze is SI Wireless' ability to essentially replace the availability of the economic impact of the now terminated ACP program for 191,000 citizens in our service area. By restoring our funding, your agency could achieve an immediate, tangible public benefit—something you can take pride in—while we, as always, will do the work. These benefits alone warrant your agency releasing this unlawful hold, aside from your agency's clear and undeniable legal obligation to do so.

If months of legal process and the production of 89 gigabytes of information—generated in response to more than 2,400 questions, most of them unrelated to the actual issue at hand—do

---

[51] *See* Exhibit E

Jae Seong, Chief Financial Officer
August 15, 2025
Page 17

not persuade you, then we ask once again that you come visit and at least make decisions of such importance on the basis of what you can find out in less than a days' time if you did. If you wait too long, however, SI Wireless may cease to exist and good and affordable service in our rural and lower income service areas will also be missing and likely for good.

While this was not a requirement under the Secure Network Act or under the FCC's rules, SI Wireless nonetheless did provide advanced communications service to customers at all times alleged to be relevant by the FCC. The *2020 Supply Chain Order* and the FCC's September 2021 webinar encouraged network operators to start removing equipment that presented serious threats to national security before SCRP implementation, and represented to those carriers that they would not be penalized for doing so. SI Wireless relied on those representations when it engaged in its network replacement project, and the FCC's promises ring hollow when it is, in fact, penalizing SI Wireless for answering the call to action to secure its network and protect American citizens from the threat of Chinese-made equipment. There is simply no justification for continuing the hold on disbursement of funds to our company.

Respectfully submitted,

*/s/ Leslie Williams*

Leslie Williams
President
SI Wireless, LLC

cc:    Joseph Calascione, Chief, Wireline Competition Bureau, FCC
       ████████████████████████████████████
       Mark Stephens, Managing Director, FCC
       Adam Candeub, General Counsel, FCC

**EXHIBIT LIST**
***(In Support of SI Wireless Response to FCC Funding Hold)***

| Exhibit | Title / Description | Date |
|---------|--------------------|------|
| Exhibit A | Sworn Customer Declarations | July-Aug 2025 |
| Exhibit B | Email re: FCC call on equipment destruction – Carri Bennett | 9/13/2021 |
| Exhibit C | SI Wireless Confidential Plan Jan 2022 | Jan 2022 |
| Exhibit D | SI Wireless Plan Confidential 030623 | 3/6/2023 |
| Exhibit E | Declaration of Patrik Melander, Chairman & CEO Connect5G | 7/28/2025 |